### In re S.M. ACQUISITION CO., d/b/a Stylemaster, Inc., an Illinois corporation, Debtor.

### S.M. Acquisition Co., d/b/a Stylemaster, Inc., an Illinois corporation, Plaintiff,

### v.

### Euler American Credit Indemnity Company, a New York corporation, Defendant.

Bankruptcy No. 02 B 10723.
Adversary No. 02 A 00989.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

April 15, 2004.

Daniel J. Zollner, Esq. Lord, Bissell & Brook, LLP, Chicago, IL, for Plaintiff.

Charles P. Schulman, Esq. Sachnoff & Weaver, Ltd., Chicago, IL, for Defendant.

***MEMORANDUM OPINION ON CROSS–MOTIONS OF PLAINTIFF FOR PARTIAL SUMMARY JUDGMENT ON ALL COUNTS AND DEFENDANT FOR SUMMARY JUDGMENT ON COUNTS I, II, AND III OF THE AMENDED COMPLAINT AND JUDGMENT ON THE PLEADINGS AS TO COUNTS II AND IV***

JACK B. SCHMETTERER,
Bankruptcy Judge.

This Adversary case arises from the bankruptcy proceeding of Debtor S.M. Acquisition Co. d/b/a Stylemaster, Inc. under Chapter 11 of the Bankruptcy Code. 11 U.S.C. § 101 et seq. S.M. Acquisition Co. ("Debtor" or "Plaintiff") filed a four-count complaint asserting that its insurer, Euler American Credit Indemnity Company ("Euler" or "Defendant"), violated Illinois law and breached provisions of the Debtor's insurance policy. Both parties filed cross motions for summary judgment. They seek determination as to validity of notices purporting to modify and cancel

insurance coverage for shipments to Kmart Corporation ("Kmart"), and also whether the Debtor's insurance policy covers an insolvency claim against Kmart. For reasons stated below, the notices in issue that changed the subject policy are found to be invalid under Illinois law and the insurance policy. Plaintiff therefore may assert its claim under the policy; however, lack of evidence on essential matters precludes judgment on any counts until the case is tried. Also, for reasons stated below, Defendant's motion for judgment on the pleadings as to Counts II and IV is denied.

## BACKGROUND

Euler has insured the Debtor since 1997. Euler sells commercial credit insurance policies indemnifying accounts receivable losses resulting from shipments of covered products. Compl. Exh. A, Sect II. The Debtor is a plastics wholesaler and ships plastic storage containers to retailers. The Debtor purchased a policy from Euler ("CreditMaster Policy" or "Policy") to cover account receivables arising from shipments to Kmart and other customers. The CreditMaster Policy covered such shipments from December 1, 2000 to November 30, 2001. Compl. Exh. A. On November 12 and 13, 2001, Euler faxed two documents to the Debtor, one canceling and one reducing coverage to Kmart. Compl. Exh. B, C.

On October 30, 2001 Euler and the Debtor began discussions for new coverage for the period following expiration of the CreditMaster Policy on November 30th. Euler prepared a Renewal Quote based on a renewal application submitted by the Debtor; however, the Renewal Quote was never fully executed.

Kmart filed for bankruptcy on January 22, 2002. The Debtor alleges that Kmart owes over $6 million for shipments in No-

vember of 2001. Compl. Exh. D, E, F. On or before January 29, 2002 the Debtor submitted a claim to Euler requesting payment under the CreditMaster Policy. Euler denied the claim, asserting that Kmart's insolvency occurred after the Policy's expiration. Compl. Exh. H. This rejection triggered the present litigation, and it pends on Debtor's Amended Complaint.

## PLEADINGS

The Amended Adversary Complaint pleads in four counts (hereinafter "Compl."). Counts I and III allege that Euler breached the CreditMaster Policy and violated the Illinois Insurance Code ("Insurance Code") by attempting to cancel or reduce the Debtor's Kmart coverage midterm and by failing to renew the CreditMaster Policy for an additional year period. Counts II and IV allege that Euler breached the CreditMaster Policy in bad faith by improperly failing to pay the Kmart claim under the CreditMaster Policy or one year extension.

In Count I, the Debtor seeks an order extending the CreditMaster Policy for a period of one year after December 1, 2001 on the same terms and conditions and requiring Euler to pay up to $5 million, plus interest, costs and attorney's fees on asserted insurance coverage on receivables for shipments to Kmart. Count II seeks recovery under the CreditMaster Policy for $3 million plus interest, costs and attorney's fees. Count III seeks recovery for $5 million plus interest, costs and attorney's fees and a statutory award of $25,000 under 215 ILL. COMP. STAT. 5/155 (2004). Count IV seeks recovery for $3 million plus interest, costs and attorney's fees and a statutory award of $25,000 under 215 ILL. COMP. STAT. 5/155 (2004).

Euler's Answer pleaded four affirmative defenses: failure to state a claim; the CreditMaster Policy did not provide cover-

age for insolvencies occurring after November 30, 2001; Debtor did not pay a premium for any alleged policy in effect after November 30, 2001; and the Illinois Department of Insurance approved the CreditMaster Policy.

Euler moved for summary judgment on all counts of the Amended Complaint, and for judgment on the pleadings as to Counts II and IV. The Debtor filed a cross-motion for partial summary judgment to determine Euler's liability on all counts of the Amended Complaint. Both parties seek summary judgment on their respective pleadings as to asserted validity or invalidity of notices purporting to modify and cancel insurance coverage for shipments to Kmart and as to whether the Debtor's insurance policy covers an insolvency claim against Kmart.

The following set of material undisputed facts was compiled by reviewing the Debtor's and Euler's memorandums of law, statements of facts and responses thereto under Bankruptcy Local Rules 7056–1 and 7056–2, the affidavits and attached exhibits used to support the allegations and denials.

### MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE

#### Policy History

1. Euler American Credit Indemnity Company ("Euler") is a New York corporation with its principle place of business in Baltimore, Maryland. (Shapiro Aff., ¶ 2)

2. Euler sells commercial credit (accounts receivable) insurance policies that protect its policyholders from credit losses during the term of the policy (the "policy period"). (Shapiro Aff., ¶ 3) Euler is the largest seller of commercial credit insur-ance policies in the United States, with over 3000 policy holders.

3. Euler is authorized to transact and sell credit insurance policies in Illinois. (Def.'s Statement of Facts ¶ 3; Pl.'s Resp. Def.'s Statement of Facts ¶ 3)

4. On March 18, 2002, S.M. Acquisition Company d/b/a StyleMaster, Inc. filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code. S.M. Acquisition Co. had its principle place of business in Illinois. (Compl.Exh.A) The Debtor is a plastics wholesaler to major retailers. (Spencer Dep. ¶ 10)

5. Euler first sold Debtor a credit insurance policy in December 1, 1997. The policy was renewed annually through November 30, 2001. (Def.'s Statement of Facts ¶ 5; Pl.'s Resp. Def.'s Statement of Facts ¶ 5; Knotek Aff., ¶ 5)

6. Mr. Alan Knotek, Euler's employee, was responsible for negotiating new policies with the Debtor. He negotiated the CreditMaster Policy. (Def.'s Statement of Facts ¶ 5; Pl.'s Resp. Def.'s Statement of Facts ¶ 5)

#### Creditmaster Policy Terms

7. Euler issued Creditmaster Insurance Policy M–362, 780–9 to the Debtor, effective December 1, 2000 through November 30, 2001. (Compl.¶ 5, Compl. Exh.A)

8. The CreditMaster Policy, drafted on a CreditMaster form, insured the Debtor against accounts receivable losses resulting from shipments of plastic storage containers to Kmart and other customers during the policy period. (Compl. Exh. A; Def.'s Statement of Facts ¶ 7; Pl.'s Resp. to Def.'s Statement of Facts ¶ 7)

9. The CreditMaster Policy covered total losses up to $7 million. (Compl.Exh. A)

10. The CreditMaster Policy provided the following coverage specifically for ship-

ments to Kmart: From December 1, 2000 to December 31, 2000 the policy covered up to $5 million, subject to a 20% coinsurance. (Def.'s Statements of Facts ¶ 17; Pl.'s Resp. Def.'s Statement of Facts ¶ 17) From January 1, 2001 to November 30, 2001 the policy covered up to $3 million subject to a 20% coinsurance. (Pl.'s Statement of Material Facts ¶ 10; Def.'s Resp. to Pl.'s Material Facts ¶ 10; Compl. Exh. A)

11. The CreditMaster Policy also covered up to $5 million for shipments to Target Corporation and $500,000 for shipments to Wal–Mart. (Compl.Exh.A)

12. The CreditMaster Policy authorized the Debtor to request Euler to add or remove customers from coverage during the policy period. All such requests were subject to Euler's approval. (Def.'s Statement of Facts ¶ 10; Pl.'s Resp. Def.'s Statement of Facts ¶ 10; Compl. Exh. A, Section III.A).

13. The premium of the CreditMaster Policy was $44,500. Euler calculated the premium based on an internally calculated premium factor of .00148 applied to anticipated or estimated sales during the term of the policy. (Compl.Exh.A)

14. The Debtor estimated sales to Kmart of $30 million from December 2000 through November 2001. (Def.'s Statement of Facts ¶ 11, 16; Pl.'s Resp. Def.'s Statement of Facts ¶ 11, 16)

15. The Creditmaster Policy required the Debtor to pay an increased premium if total sales during the policy period exceeded 10%. (Def.'s Statement of Facts ¶ 12; Pl.'s Resp. Def.'s Statement of Facts ¶ 12)

16. The Creditmaster Policy specified that the Debtor could file a claim when a covered customer did not made timely payments or when the customer became insolvent during the policy period. (Compl. Exh. A, Section IV; Def.'s Statements of Facts ¶ 13; Pl.'s Resp. Def.'s Statement of Facts ¶ 13)

17. A claim for an insolvent customer had to be filed by the earlier of three dates: within 10 days of learning of the insolvency; within 90 days from the date of the insolvency; or within 45 days after the end of the policy period. (Compl. Exh. A, Section IV.A.1.a)

18. The CreditMaster Policy defined insolvency to include the filing of a voluntary or involuntary petition for relief under Title 11 (including Chapters 7, 11 and 13) of the United States Bankruptcy Code by or against a customer. (Compl. Exh. A, Section IX.I.1)

19. The filing of a claim eliminated any future coverage on that customer. (Compl. Exh. A, Section IV.A.1c; Shapiro Aff., ¶ 11)

### Creditmaster Policy Modification Notices

20. Euler had approximately $225 million in exposure to Kmart through its coverage of various policyholders including Plaintiff. Due to Kmart's deteriorating financial status Euler decided to reduce its exposure to Kmart on a company-wide basis. On November 13, 2001, it unilaterally cancelled Kmart's coverage for its policyholders, and on November 12, 2001, it then unilaterally reduced coverage limits as to Kmart. (Pl.'s Material Facts ¶ 30, 31; Def's Resp. Pl.'s Material Facts ¶ 30, 31; Bergeron Dep. at 9–11, 14, 26, 28)

21. The foregoing Notices of the actions set forth in Finding No. 20 were faxed to the Debtor on November 12th and 13th, 2001. Euler thereby sent the notices approximately eighteen days before expiration of the CreditMaster Policy term. Euler contends that it intended the notices to take effect immediately.

22. The November 12, 2001 notice, titled "Additional Decision Summary" stated

that the gross amount covered for insurance of Kmart accounts would be reduced from $3 million to $1 million for future shipments. (Compl. 11; Answ. 11; Compl. Exh. B.)

23. The Additional Decision Summary was not mailed to the Debtor at least 60 days prior to the asserted effective date. (Pl.'s Material Facts ¶ 26; Def.'s Resp. Pl.'s Material Facts ¶ 26)

24. The November 13, 2001 notice stated that coverage for future shipments to Kmart would be cancelled. ("Kmart Notice"). (Compl. 12; Answ, 12, Compl. Exh C)

25. The Kmart Notice was not mailed to the Debtor at least 60 days prior to the asserted effective date, nor did it provide a reason for the cancellation. (Pl.'s Material Facts ¶ 29; Def.'s Resp ¶ 29; Compl. Exh. C)

26. The Creditmaster Policy remained in effect after Euler faxed these notices. (Def.'s Statement of Facts ¶ 19; Pl.'s Resp. Def.'s Statement of Facts ¶ 19)

### *Renewal Discussions and Terms of the Renewal Quote*

27. On October 30, 2001, Knotek advised the Debtor that Euler needed certain information regarding the amount of new coverage that the Debtor wished to obtain for 2002 in order to prepare a renewal policy quote. (Def.'s Statement of Facts ¶ 23; Pl.'s Resp. Def.'s Statement of Facts ¶ 23; Knotek Aff., ¶ 8, Knotek Exh. 1)

28. The Debtor submitted a renewal application and accounts receivables aging for all customers as of November 16, 2001. (Knotek Aff., ¶ 9, Knotek Exh. 2 and 3, Pl.'s Resp. Def.'s Statement of Facts ¶ 24)

29. In the renewal application, the Debtor estimated total future sales of $43 million for the year commencing December 1, 2001. Kmart was projected to account for $31 million of this amount.

30. On November 29, 2001 Euler faxed the Debtor an offer of terms and conditions for a possible new policy to become effective December 1, 2001. ("Renewal Quote")

31. The Renewal Quote proposed a premium of $52,800 and a policy amount of $4 million. (Compl.Exh.I)

32. In calculating the Renewal Quote Euler treated sales to Kmart, an estimated $31 million, as a separate policy. The proposed premium to cover shipments to Kmart was $30,000. The proposed premium for other customers was $22,800. (Def.'s Statement of Facts ¶ 30; Pl.'s Resp. Def.'s Statement of Facts ¶ 30, Compl. Exh. I)

33. For non-Kmart sales, the premium factor in the Renewal Quote was .0019, subject to a 20% co-insurance requirement. (Pl.'s Material Facts ¶ 64; Def.'s Resp. Pl.s Material Facts ¶ 64; Molli Dep. at 34–38)

34. The premium factor under the CreditMaster Policy was .00148 but there was no coinsurance for non-Kmart losses.(Compl. Exh. A, Moli Dep. at 33–34, 36, Pl.s Material Facts ¶ 63; Def.'s Resp. Pl.'s Material Facts ¶ 63)

35. The Renewal Quote stated that the Maximum Claim Filing would be "180 days from shipment or 150 days from due date, but no longer than 10 days after the end of the policy period." (Compl.Exh.I.)

36. The Renewal Quote specified that all of its provisions would be issued on a Domestic Markets Policy form and subject to the Domestic Markets Policy terms and conditions. Euler was phasing out the Creditmaster form and replacing it with the Domestic Markets Policy form, but it was still possible to renew the CreditMaster Policy on the CreditMaster Policy form. (Pl.'s Material Facts ¶ 47; Def's

Resp. Pl.s Material Facts ¶ 47; Molli Dep. at 16–17, Compl. 27; Answ. 27)

37. Euler did not provide the Debtor with a copy of the Domestic Market Policy provisions at the time of the Renewal Quote. The Debtor never saw the Domestic Markets Policy form prior to this litigation. (Pl.'s Material Facts ¶ 33; Def.'s Resp. Pl.'s Material Facts ¶ 33)

38. The Renewal Quote did not list the endorsements or exclusions that would be included in the Domestic Markets Policy form. (Knotek Dep. at 44–45; Pl.'s Material Facts ¶ 44, 45; Def.'s Resp. Pl.'s Material Facts ¶ 44, 45)

39. The CreditMaster Policy was a claims made or loss occurring policy that covered shipments only if the insolvency or past due accounts fell within the time frames set forth in the policy. (Compl.Exh.A)

40. In contrast, the Domestic Markets Policy was a "risk attaching" policy that covered shipments during the policy period regardless of whether the insolvency or past due accounts occurred in the policy period. (Knotek Dep. at 41–43, 57 Molli Dep. at 18–10, 41; Domestic Markets Policy Form, Shapiro Aff., ¶ 19, Def.'s Statement of Facts ¶ 35; Pl.'s Resp. to Def.'s Statement of Facts ¶ 35)

41. Euler faxed the Renewal Quote to the Debtor but never mailed it through the U.S. Postal Service. (Pl.'s Material Facts ¶ 40; Def's Resp. Pl.'s Material Facts ¶ 40; Knotek Dep. at 22–23)

42. The parties never executed the Renewal Quote. (Def. Mot. Summ Judgment at 12.)

### Filings with Illinois Department of Insurance

43. Euler files its policy forms with the Illinois Department of Insurance as required by Illinois law. (Def's Resp. Pl.s Material Facts ¶ 22)

44. The Department of Insurance reviews the filings to ensure that they comply with Illinois law. 215 ILL. COMP. STAT. 5/143(2) (2004).

45. Euler filed the CreditMaster Policy form with the Department of Insurance in 1995. (Def's Resp. Pl.'s Material Facts ¶ 34)

46. Euler filed the Domestic Markets Policy form with the Department of Insurance in 1997. (Def.'s Resp. Pl.'s Material Facts ¶ 36)

47. Euler attaches an Amendatory Endorsement Form ("Illinois Endorsement") to all of its policies to ensure that they comply with the Illinois Insurance Code. (Def's Resp. Pl.s Material Facts ¶ 22; Pl.'s Exh. ACI–00301)

48. The Illinois Endorsement stated that Euler could not cancel or terminate the CreditMaster Policy in violation of Illinois law. (Pl.'s Exh. ACI–00301)

49. Euler mistakenly omitted the Illinois Endorsement from the CreditMaster Policy at the time of issuance. (Def's Resp. Pl.s Material Facts ¶ 23)

50. Although Euler did not include the Endorsement with the CreditMaster Policy, Euler still had to comply with its terms and provisions. (Def's Resp. Pl.s Material Facts ¶ 24)

### Submission of the Kmart Claim

51. Kmart filed a petition for bankruptcy in the United States District Court, Northern District of Illinois, Eastern Division, on January 22, 2002.

52. At the time Kmart filed for bankruptcy protection, the Debtor's Kmart accounts receivable was in excess of $6.8 million. (Compl. Exh D, E, F; Pl.'s Material Facts ¶ 74; Def's Resp. Pl's Material Facts ¶ 74)

53. On or before January 29, 2002, the Debtor submitted a Notification of Claim and supporting documentation to Euler seeking recovery for $6,858,107.00.

54. This amount consisted of $1,199,368.40 for Kmart shipments up to November 12, 2001; $3,008,783.50 for shipments from November 13 through November 30, 2001; and $2,666,157.20 for shipments after November 30, 2001. (Compl. Exh. E and F)

55. The Debtor filed the Notification of Claim and Supporting Documentation within 10 days of learning of Kmart's insolvency and within 90 days of Kmart's insolvency. (Compl. 24; Answ 24)

56. Euler denied the Kmart claim on at least two occasions.

57. By letter dated February 14, 2002, Euler denied the Kmart claim stating that "No coverage [was] in force for shipment periods in which [the] claim was submitted" and that the "policy requires that a claim must be filed 45 days after expiration of the policy which was 11/30/01, thus the latest date to file a claim would have been 1/14/02." (Compl.Exh.G)

58. By letter dated March 11, 2002 Euler again denied the Kmart claim stating that the CreditMaster Policy "provided coverage for shipments to Kmart during the period of December 1–December 31, 2000 only" and that the Creditmaster Policy "also requires that the insolvency occur during the policy period." (Compl. Exh H)

59. Euler continues to deny the Kmart claim.

60. Additional facts set forth in the Discussion that follows are not disputed.

### JURISDICTION

■ Subject matter jurisdiction lies under 28 U.S.C. § 1334. This Adversary concerns the interpretation and adjudication of rights regarding a debtor's insurance policy. A debtor's insurance policy is property of the estate, *Maxwell v. Megliola (In re marchFIRST, Inc.)*, 288 B.R. 526, 530 (Bankr.N.D.Ill.2002), therefore this is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E). Reference of the matters and issues herein were made to the bankruptcy court under District Court Internal Operating Procedure 15(a). Venue is proper in this District under 28 U.S.C. § 1409(a).

### STANDARDS FOR SUMMARY JUDGMENT

Fed.R.Civ.P. 56(c) is applicable here pursuant to Fed. R. Bankr.P. 7056. Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits showing that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). *Tyler v. Runyon*, 70 F.3d 458, 464 (7th Cir.1995).

■ Summary judgment is granted to avoid unnecessary trials when there is no genuine issue of material fact in dispute. *Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Ass'n of Indianapolis*, 806 F.2d 146, 149 (7th Cir. 1986). On a summary judgment motion, inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348; *Marine Bank Nat'l Ass'n v. Meat*

*Counter, Inc.*, 826 F.2d 1577, 1579 (7th Cir.1987). However, existence of a material factual dispute is sufficient to block judgment only if the disputed fact is determinative of the outcome under applicable law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Egger v. Phillips*, 710 F.2d 292, 296 (7th Cir.1983) (en banc), *cert. denied*, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983).

■ Of course, a party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motions and must identify those portions of the "pleadings, depositions, answers to interrogatories, and affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. However, once the motion for summary judgment is made and supported as described above, Rule 56(e) provides that a party opposing the motion may not rest upon the mere allegations or denials in his pleading, but its response must set forth specific facts showing a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. *Tyler v. Runyon*, 70 F.3d 458, 464 (7th Cir.1995). When the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

■ When both parties move and argue for summary judgment, that does not by itself indicate that there are no genuine issues of material fact; the court must rule on each motion separately in determining whether each judgment may be entered in accordance with applicable principles. *ITT Indus. Credit Co. v. D.S. America, Inc.*, 674 F.Supp. 1330, 1331 (N.D.Ill.1987); *District 12, United Mine Workers of Am.*

*v. Peabody Coal, Co.*, 602 F.Supp. 240, 242 (S.D.Ill.1985); *see* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2720 (3d ed. 1998 & Supp.2003). Cross-motions for summary judgment do not require the court to decide the case on those motions; the court can deny both motions if both parties have failed to meet the burden of establishing that no genuine issue of material fact exists and that they are entitled to judgment as a matter of law. *ITT*, 674 F.Supp. at 1331; *Wolf v. Maryland Casualty*, 617 F.Supp. 456, 458 (S.D.Ill.1985); *see* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2720 (3d ed. 1998 & Supp.2003).

### THE ILLINOIS INSURANCE CODE

On November 13, 2001 Euler faxed the following to the Debtor:

> In accordance with the provisions of the above captioned policy and/or any endorsement made part thereof under which coverage is provided on KMART CORPORATION, TROY MI USA we hereby cancel as to future shipments the coverage applicable to this debtor.

Compl. Exh. C.

On the prior day, Euler faxed a notice titled Additional Decision Summary dated November 12, 2001. The Additional Decision Summary stated Euler's intent to reduce the coverage applicable to Kmart from $3 million to $1 million. The letter explained that "[t]his decision is based on our overall assessment of [Kmart's] risk." Compl. Exh. B. Although the CreditMaster Policy had not expired or terminated, Euler intended these changes to take effect immediately.

■ The parties agree that Illinois law applies to coverage issues presented here. Illinois law requires insurers to provide notice to their insureds of policy cancellations, changes in coverage materially alter-

ing policies, and policy non-renewals. *See* ILL. COMP. STAT. 5/143 et seq. The Illinois Insurance Code describes the content to be included in such notices, defines the time period in which the notices must be mailed and requires insurers to maintain proof of mailing. These requirements "are not mere technicalities, but are important provisions enacted by the legislature to protect insureds from having significant changes made to their insurance coverage without their knowledge." *Ragan v. Columbia Mutual Ins. Co.*, 183 Ill.2d 342, 701 N.E.2d 493, 233 Ill.Dec. 643 (1998). Failure to comply with these notice provisions can, in certain circumstances, extend the policy for an additional year. *See* 215 ILL. COMP. STAT. 5/143.17a(c). If a one year statutory extension is found in this case, that would mean that the Debtor's Kmart claim falls within the policy period of the CreditMaster Policy as thereby extended.

It is clear that Euler did not comply with the statutory notice provisions, but Euler asserts that the Illinois statutes requiring notice are inapplicable. The basis of Euler's summary judgment motion is that the changes enacted by the Kmart Notice and Additional Decision Summary to the CreditMaster Policy (1) were not cancellations as defined in 215 ILL. COMP. STAT. 5/143.13(g); (2) did not materially alter the CreditMaster Policy as defined in 215 ILL. COMP. STAT. 5/143.17a(b) and (3) Euler, at all times, manifested a willingness to renew the Policy, 215 ILL. COMP. STAT. 5/143.17a(a). Euler concludes therefore that its two notices did not violate the Insurance Code and the statutory penalty for failing to comply with the notice provisions (which is the one-year extension of the policy) cannot be imposed. According to Euler the CreditMaster Policy expired before submission by Plaintiffs of its Kmart claim and Euler is therefore entitled to summary judgment.

The Debtor disagrees, asserting in its cross motion for summary judgment that, as a matter of law, the notices were not served within the time frames required under the Insurance Code and Euler's noncompliance with the notice requirement means that the statute extends the policy period of the CreditMaster Policy to cover the Kmart claim.

## THE KMART NOTICE AND ADDITIONAL DECISION SUMMARY WERE NOT CANCELLATIONS AS DEFINED IN THE INSURANCE CODE

■ The Debtor characterizes the notice of November 12, 2001, as a cancellation notice. Euler, on the other hand, characterizes it as a reduction in coverage. The Insurance Code regulates each differently.

The Insurance Code contains several statutory provisions regulating the circumstances and manner in which an insurance company may cancel an insurance policy. *See* Illinois Jurisprudence, Insurance § 4:53–4:77 (2003).

Insurers can cancel policies only in accordance with their policy cancellation provisions, 215 ILL. COMP. STAT. 5/143.11, or through proof of the applicability of exceptions listed in statute. 215 ILL. COMP. STAT. 5/143.16a;[1] *Horan & Co. v. Republic Ins. Group*, 175 Ill.App.3d 735, 737, 530 N.E.2d 275, 276, 125 Ill.Dec. 247

---

1. Under the Illinois Insurance Code, a policy may not be cancelled except for the following reasons: "(a) Nonpayment of premium, (b) The policy was obtained through material misrepresentation, (c) Any insured violated any of the terms and conditions of the policy, (d) The risk originally accepted has measurably increased; (e) Certification to the Director of the loss of reinsurance by the insurer which provided coverage to the insurer for

(1988) ("The insurer is held to two standards when cancelling a policy. The insurer must first comply with the terms contained in its own policy, and then must comply with the notice provisions of the [statute].")

■ Furthermore, cancellation notices must be mailed within a specific period, to specific parties, and detailing the reasons for cancellation. Insurers must maintain proof of this mailing. 215 ILL. COMP. STAT 5/143.16; 5/143.14. Noncompliance invalidates any attempted cancellation and the policy continues. *Republic Ins. Group,* 175 Ill.App.3d at 737, 125 Ill.Dec. 247, 530 N.E.2d 275 ("Without strict compliance to the cancellation provision, there could be no valid cancellation by ... the insurer.")

Euler admits that it did not follow the statutory notice provisions, did not maintain proof of mailing, did not provide a reason for cancellation and did not satisfy other requirements of the statutes when it faxed the Kmart Notice (of November 12th) and Additional Decision Summary (the notice of November 13, 2003) to the Debtor. It argues that those requirements are not binding because the Kmart Notice and the Additional Decision Summary were not cancellations.

The Debtor argues that the Kmart Notice is a cancellation notice because Euler's agent referred to it as such in his deposition, and Euler intended any reduction or termination of coverage for a specified customer to be a termination of the Policy in the Illinois Endorsement. Debtor's Mem. Supp. Summary Judgment at 4; Resp. to Euler's Summary Judgment Motion at 5.

Euler responds that although the Kmart Notice cancelled coverage for Kmart the rest of the Creditmaster Policy remained in force. For example, it points out that the Debtor could have submitted a claim if Kmart became insolvent or defaulted during the policy period before the Kmart Notice and Additional Decision Summary took effect. Further, shipments to customers other than Kmart remained covered and the Debtor could have filed a claim for these customers. Def.'s Mem. Supp. Mot. Summary Judgment at 6–8.

Euler's argument is persuasive in this regard. Although Euler intended to cancel coverage for future shipments to Kmart, the Debtor's other rights under the Policy were not terminated. The Debtor admits that the CreditMaster Policy remained in effect after the Notices were sent and that it could file claims for insolvency or losses from its other customers and Kmart.[2] This right arises directly from the CreditMaster Policy and neither the Kmart Notice nor the Additional Decision Summary cancelled it.

Further, the Debtor's support for its position is not persuasive; an employee's

---

all or a substantial part of the underlying risk insured; or (f) A determination by the Director that the continuation of the policy could place the insurer in violation of the insurance laws of this State." 215 ILCS 5/143.16a.

2. The Debtor's admission is from its Response to Defendant's Statement of Facts in paragraph 19. The response states: "The Policy remained in effect after the notices were sent in November 2001, and the Debtor retained coverage on other buyers under the Policy, and could have added other buyers until the end of the Policy. The Debtor could still have made a claim during the policy period ... The Debtor could also have filed an insolvency claim on Kmart prior to that date. The Debtor could also have filed an insolvency claim on Kmart if Kmart became insolvent during the term of the Policy.

*RESPONSE (sic):* S.M. Acquisition admits the allegations contained in Paragraph 19 except that it asserts that the notices were defective, that Mr. Knotek told it not to file past dues claim until the invoices were at least 30 days overdue and that all coverage continued through November 30, 2001 and for the next year as well."

self-serving description does not outweigh the plain meaning of the Notices or their effect on the CreditMaster Policy, and a plain reading of the Illinois Endorsement does not support the Debtor's assertion.

The most compelling reason to reject the Debtor's argument, however comes from the statute. Section 5/143.13(g) states that "[c]ancellation" or "cancelled" means the termination of a policy by an insurer prior to the expiration date of the policy. 215 ILL. COMP. STAT. 5/143.13(g) (2004). That provision is unambiguous: a "cancellation" must terminate the policy prior to the policy's expiration date. A policy is not cancelled if the insured retains the power to exercise rights arising from the policy.

The Debtor responds that an unscrupulous insurer could constructively cancel an insurance policy without notice by reducing the policy limits or by cancelling all but an insignificant part of the policy. The Illinois Legislature appears to have contemplated this issue. The answer lies in Section 143.17a, which addresses material alterations to insurance policies. 215 ILL. COMP. STAT. 5/143.17a (2004). A material alteration, however, is not a "cancellation." It must be concluded that the Kmart Notice and Additional Decision Summary did not cancel the CreditMaster Policy.

■ However, as discussed below, Euler's notices did seek to alter the subject policy materially, but without compliance with statutory notice requirements.

### THE KMART NOTICE AND ADDITIONAL DECISION SUMMARY PROPOSED MATERIAL ALTERATIONS TO THE CREDITMASTER POLICY AND ARE INVALID UNDER SECTION 143.17A

■ Section 143.17a(b) provides in pertinent part:

no company may increase the renewal premium on any policy of insurance by 30% or more, *nor impose changes in deductibles or coverage that materially alter the policy,* unless the company shall have mailed or delivered to the named insured written notice of such increase or change in deductible or coverage at least 60 days prior to the renewal or anniversary date. . . .

An exact and unaltered copy of such notice shall also be sent to the insured's broker, if known, or the agent of record. If an insurer fails to provide the notice required by this subsection, then the company must extend the current policy under the same terms, conditions, and premium to allow 60 days notice of renewal and provide the actual renewal premium quotation and any change in coverage or deductible on the policy. Proof of mailing or proof of receipt may be proven by a sworn affidavit by the insurer as to the usual and customary business practices of mailing notice pursuant to this Section or may be proven consistent with Illinois Supreme Court Rule 236. (Emphasis added)

215 ILL. COMP. STAT. 5/143.17a(b) (2004). Section 143.17a(b) thereby provides that an insurer may not impose changes in coverages that materially alter the policy without the required statutory notice. If an insurer does not provide that notice, the material changes in coverage are void and the policy continues for 60 days. 215 ILL. COMP. STAT. 5/143.17a(b) (2004); *Guillen v. Potomac Insurance Company of Illinois,* 203 Ill.2d 141, 153 785 N.E.2d 1, 271 Ill.Dec. 350 (2003) ("when a notification requirement is not satisfied with respect to a material modification to an insurance policy, the modification does not take effect.") Euler

has admitted that it did not provide notice as required by the statute.

## MATERIAL ALTERATIONS

■ Section 143.17a does not define the phrase "materially alter." The Illinois Supreme Court, however provided interpreting instructions in *Guillen*, 203 Ill.2d at 153–155, 271 Ill.Dec. 350, 785 N.E.2d 1. A material modification to an insurance policy "is one that makes significant changes to that policy" and "is an important transaction that may have a serious effect on the interests of the insured." *Ibid.*, at 153, 154, 271 Ill.Dec. 350, 785 N.E.2d 1. The modification will often "not be a change that increases coverage, but, instead, will be a partial cancellation or reduction in coverage for the insured." *Ibid.*, at 153, 271 Ill.Dec. 350, 785 N.E.2d 1.

"Although, in most cases, the material modification [will be made] by the insurer" the perspective of the insured is taken into account. *Ibid.* at 153, 271 Ill.Dec. 350, 785 N.E.2d 1 ("the material modification may be equally as significant from the perspective of the insured ... Indeed, the attempted modification in this case, the lead exclusion, would be significant from the [insured's] point of view since it would have eliminated coverage for an entire category of serious claims brought against them.")

In this case, the Kmart Notice and the Additional Decision Summary attempted to reduce coverage for prior Kmart shipments during the term of the CreditMaster Policy from $3 million to $1 million and eliminate future coverage for Kmart shipments. From the Debtor's perspective, Kmart was its primary source of revenue. Of the Debtor's estimated sales in 2002, for example, Kmart accounted for 72%. Knotek Aff., ¶ 9, Knotek Exh. 2. Given Kmart's deteriorating financial condition

and the Debtor's dependency on Kmart, Euler's reductions in coverage would have been detrimental to the Debtor's viability. Both Notices were therefore material alterations to the CreditMaster Policy.

■ As an alternative argument, Euler insists that even if the Notices materially altered the CreditMaster Policy, it did not have to follow the statute. According to Euler, all CreditMaster policies permit Euler to reduce or cancel coverage for a specified customer without advanced notice. Because the Illinois Department of Insurance has found the CreditMaster Policies to be compliant with Illinois law, Euler asserts that the terms and conditions of the CreditMaster Policies are entitled to a presumption or inference of validity. Def.'s Mem. Supp. Summary Judgment at 8.

Under the Insurance Code, the Director of Insurance has the responsibility to disapprove and discontinue any insurance policy provision that he or she determines to be "misrepresentative, unjust, unfair, inequitable, ambiguous, misleading, inconsistent, deceptive, contrary to law or public policy of [Illinois], or contains exceptions or conditions which unreasonably or deceptively affect the risk purported to be assumed in the general coverage of the policy." *See* 215 ILL. COMP. STAT. 5/143(2) (2004). As the Illinois Supreme Court makes clear, approval of an insurance policy provision by the Illinois Department of Insurance, though not conclusive upon Illinois courts, is "entitled to great weight as against contention that such a provision is against public policy." *American Home Assurance Co. v. Stone*, 61 F.3d 1321, 1328 (7th Cir.1995) (quoting *Kirk v. Financial Security Life Ins. Co.*, 75 Ill.2d 367, 389 N.E.2d 144, 148, 27 Ill.Dec. 332 (1978)).

Although the Department's approval of a policy is afforded deference, no such presumption or inference of validity ap-

plies to any provisions in the CreditMaster Policy permitting Euler to cancel or reduce coverage without notice and contrary to the statutory requirement. Adopting Euler's argument would effectively nullify the Insurance Code's notice requirements. Illinois Courts have repeatedly "recognized the importance of the insurer's obligation to provide notice to its insured of changes that materially diminish insurance coverage." *Ragan,* 183 Ill.2d 342, 233 Ill. Dec. 643, 701 N.E.2d 493; *Guillen,* 203 Ill.2d at 156–7, 271 Ill.Dec. 350, 785 N.E.2d 1; *Conley v. Ratayzcak,* 92 Ill.App.3d 29, 33, 414 N.E.2d 500, 46 Ill.Dec. 616 (Ill.App. 1980) ("The purpose of a notice provision required by a statute dealing with the cancellation ... is to make the insured aware that his policy is being terminated and to afford him time to obtain other insurance."). The importance attached to the notice requirements under Illinois law requires a rejection of Euler's assertion.

Lastly, Euler declares that requiring a 60 day notice of every reduction or cancellation in coverage for a specific buyer would make it impossible to sell credit insurance in Illinois. It must be assumed that the Illinois Legislature weighed the burdens of the notice provisions on insurers when drafting the Insurance Code and nonetheless established an unambiguous 60 day notice provision. The Legislature has clearly imposed a duty of notice on insurers and that decision must be respected. Euler's policy argument would have this court substitute a policy decision contrary to the decision embedded in the statute.

Since Euler did not comply with the notice provisions of Section 143.17a(b), and the Kmart Notice and Additional Decision Summary were material changes, they never became part of the CreditMaster Policy.

## SECTION 143.17A. EXTENDS THE POLICY PERIOD OF THE CREDITMASTER POLICY

The Debtor contends that Section 143.17a extends the policy period of the CreditMaster Policy (which was to end by its terms on November 30, 2001) for one year to include the filing of the Kmart claim (of which Euler was notified on January 29, 2001, following the Kmart bankruptcy filing on January 22, 2001). Debtor's Mem Supp Partial Summary Judgment at 7. Section 143.17a provides in pertinent part:

a. No company shall fail to renew any policy of insurance ... unless it shall send by mail to the named insured at least 60 days advance notice of its intention not to renew. The company shall maintain proof of mailing of such notice on one of the following forms: a recognized U.S. Post Office form or a form acceptable to the U.S. Post Office or other commercial mail delivery service. An exact and unaltered copy of such notice shall also be sent to the insured's broker, if known, or the agent of record and to the mortgagee or lien holder at the last mailing address known by the company.

b. This Section does not apply if the company has manifested its willingness to renew directly to the named insured. Provided, however, that no company may increase the renewal premium on any policy of insurance by 30% or more, nor impose changes in deductibles or coverage that materially alter the policy, unless the company shall have mailed or delivered to the named insured written notice of such increase or change in deductible or coverage at least 60 days prior to the renewal or anniversary date. If an insurer fails to provide the notice required by this subsection, then the company must extend the current policy

under the same terms, conditions, and premium to allow 60 days notice of renewal and provide the actual renewal premium quotation and any change in coverage or deductible on the policy. Proof of mailing or proof of receipt may be proven by a sworn affidavit by the insurer as to the usual and customary business practices of mailing notice pursuant to this Section or may be proven consistent with Illinois Supreme Court Rule 236.

c. Should a company fail to comply with the non-renewal notice requirements of subsection a., the policy shall be extended for an additional year or until the effective date of any similar insurance procured by the insured, whichever is less, on the same terms and conditions as the policy sought to be terminated, unless the insurer has manifested its intention to renew at a different premium that represents an increase not exceeding 30%.

215 ILL. COMP. STAT. 5/143.17a (2004). Euler asserts that Section 143.17a does not apply since it has manifested willingness to renew directly to the insured. As proof, Euler points to its annual renewal of Debtor's policies and the 2001 Renewal Quote.

Def.'s Mem Supp Motion for Summary Judgment at 9–10.

The first sentence of Section 143.17a(b) states that "[t]his Section does not apply if the company has manifested its willingness to renew directly to the name insured." Under Euler's interpretation, compliance with this provision means that the entire statute is inapplicable.

Euler's argument parses the statute as follows: All provisions of Section 143.17a use the term "subsection." Section 143.17a(a) describes the provisions of another statute as "subsections." Section 143.17a(b) refers to itself as a "subsection." Section 143.17a(c) refers to Section 143.17a(a) as a "subsection." These provisions are read by Euler to imply that since the term "subsection" denotes a provision, use of the term "Section" refers to the complete statute.

 Euler did not cite any legal authority for its interpretation and research reveals no cases specifically on point. Section 143.17a however, is similar to Section 143.17 of the Illinois Insurance Code. Section 143.17 applies to automobile insurance but contains analogous provisions.[3] In

---

3. Section 143.17 provides:

Sec. 143.17. Notice of intention not to renew. a. No company shall fail to renew any policy of insurance, as defined in subsections (a), (b), (c), and (h) of Section 143.13 [215 ILCS 5/143.13], to which Section 143.11 [215 ILCS 5/143.11] applies, unless it shall send by mail to the named insured at least 30 days advance notice of its intention not to renew. The company shall maintain proof of mailing of such notice on a recognized U.S. Post Office form or a form acceptable to the U.S. Post Office or other commercial mail delivery service. An exact and unaltered copy of such notice shall also be sent to the insured's broker, if known, or the agent of record and to the mortgagee or lien holder at the last mailing address known by the company. However, where cancellation is for nonpayment of premium, the notice of cancellation must be mailed at least 10 days before the effective date of the cancellation.

b. This Section does not apply if the company has manifested its willingness to renew directly to the named insured. Such written notice shall specify the premium amount payable, including any premium payment plan available, and the name of any person or persons, if any, authorized to receive payment on behalf of the company. If no person is so authorized, the premium notice shall so state. The notice of nonrenewal and the proof of mailing shall be effected on the same date. b–5. This Section does not apply if the company manifested its willingness to renew directly to the named insured. However, no company may impose changes in deductibles or coverage for any policy forms applicable to an entire line of business enumerated in subsections (a), (b), (c), and (h) of Section 143.13

*Olympic Federal v. American Interinsurance Exchange*, 203 Ill.App.3d 942, 561 N.E.2d 226, 148 Ill.Dec. 920 (1990), the Illinois Appellate Court affirmed the lower Circuit Court's holding that "section (b) provides that section (a) does not apply when the insurance company has manifested its willingness to renew directly to the insured."

That holding should apply here [4]. If an insured has manifested it's willingness to renew directly to the insured, then Section 173.17a(a) is inapplicable, but not the entire Section 173.17a.

■ Adoption of Euler's position would require the Courts to apply Section 143.17a differently than Section 143.17. There is no indication that the Illinois Legislature intended to treat procedural requirements for casualty policies different from the same or similar procedural requirements as to automobile policies. *See*

*Jackson v. H. Frank Olds, Inc.*, 65 Ill. App.3d 571, 578, 382 N.E.2d 550, 22 Ill. Dec. 230 (Ill.App.1978) ("when two statutes relate to the same subject matter .. the two should be construed harmoniously") Euler, therefore must comply with the notice provisions of Section 143.17a(b).

■ Moreover, Euler must also comply with the notice provisions of Section 143.17a(a) since it has not manifested its willingness to renew directly to the insured. A renewal occurs when the insured offers the same or similar coverage. *See* ILL. COMP. STAT. 5/143.13(g) (2004) [5] (defining "to renew" as any successive policies issued by the same insurer to the same insured, for the same or similar coverage, shall be considered a renewal policy); *Dungey v. Haines & Britton, Ltd.*, 155 Ill.2d 329, 334, 614 N.E.2d 1205, 185 Ill.Dec. 520 (1993) ("renewal of a policy is, in effect, a new contract of assurance, being, unless otherwise expressed, on the

[215 ILCS 5/143.13] to which Section 143.11 [215 ILCS 5/143.11] applies unless the company mails to the named insured written notice of the change in deductible or coverage at least 60 days prior to the renewal or anniversary date. An exact and unaltered copy of the notice shall also be sent to the insured's broker, if known, or the agent of record.

c. Should a company fail to comply with (a) or (b) of this Section, the policy shall terminate only on the effective date of any similar insurance procured by the insured with respect to the same subject or location designated in both policies.

d. Renewal of a policy does not constitute a waiver or estoppel with respect to grounds for cancellation which existed before the effective date of such renewal.

e. In all notices of intention not to renew any policy of insurance, as defined in Section 143.11 [215 ILCS 5/143.11] the company shall provide a specific explanation of the reasons for nonrenewal.

4. The trial court had interpreted Section 143.17 as written in 1990. The 1990 statute contained the provision in dispute here. It read: "(a) No company shall fail to renew any

policy of insurance ... unless it shall send by mail to the named insured and the mortgagee or lien holder ... at least 30 days advanced notice of its intention not to renew. An exact and unaltered copy of such notice shall also be sent to ... the lien holder ... However, where cancellation is for nonpayment of premium, at least 10 days notice of cancellation shall be given.

(b) This Section does not apply if the company has manifested its willingness to renew directly to the named insured." Ill.Rev.Stat. 1985, ch. 73, pars. 755.17(a), (b).

5. Section 143.13 provides: (d) "Renewal" or "to renew" means (1) any change to an entire line of business in accordance with subsection b–5 of Section 143.17 [215 ILCS 5/143.17] and (2) the issuance and delivery by an insurer of a policy superseding at the end of the policy period a policy previously issued and delivered by the same insurer or the issuance and delivery of a certificate or notice extending the term of a policy beyond its policy period or term; however, any successive policies issued by the same insurer to the same insured, for the same or similar coverage, shall be considered a renewal policy.

same terms and conditions as were contained in the original policy.")

■ In contrast, a renewal does not occur when an insured offers coverage different than that contained in the original policy. *See Perry v. Economy Fire & Casualty Company*, 311 Ill.App.3d 69, 724 N.E.2d 151, 243 Ill.Dec. 842 (Ill.App.1999) (finding a nonrenewal where a subsequent policy contained a lead paint exclusion while the original did not; presence of the exclusion in the subsequent policy constituted a material change in coverage.); *Elson v. State Farm Fire & Casualty Co.*, 295 Ill.App.3d 1, 691 N.E.2d 807, 229 Ill. Dec. 334 (Ill.App.1998) (finding non-renewal when the insured's original policy contained coverage for water damage from sewer or drain backup the 1991 and subsequent policies did not).

The Renewal Quote by Euler did not offer the same coverage as the original CreditMaster Policy. *See* Undisputed Facts 31–40. The Renewal Quote specified that the coverage of the Domestic Markets Policy would apply to all future policies. Compl. 27, Answ. 27. The Domestic Markets Policy provided coverage based on risk, insuring all shipments made during the policy period. In contrast, the CreditMaster Policy provided limited coverage—insuring shipments only to insolvent or defaulting customers during the policy period. Compl Exh. A; Shapiro Aff., ¶ 9, Def.'s Statements of Undisputed Facts ¶ 35

If the Domestic Markets Policy coverage had been in effect for the period of December 1, 2000 to November 30, 2001, the Kmart loss would have been covered thereby avoiding this litigation and its costs. Since the coverages of the Domestic Markets Policy and the CreditMaster Policy differed, the provisions of Section 143.17a(a) apply.

■ Euler argues in the alternative that, even if the Domestic Markets Policy proposed different coverage than the CreditMaster Policy, Section 143.17a(a) should not apply because the Debtor lacks standing to assert that provision. According to Euler, the Debtor requested changes in the Renewal Quote and subsequently declined to purchase the policy. Def.'s Mem Supporting Summary Judgment at 12. Euler concludes that an insured who decides not to purchase a renewal policy has not been injured by the failure of its insured to follow the Insurance Code. Def.'s Mem. Opp. Pl.'s Motion for Partial Summary Judgment at 5.

Euler misinterprets the statute. Even if the Debtor requested changes to the Renewal Quote, that would not excuse the insurer's duties and obligations under the Insurance Code to give proper notice of material changes in an existing policy. If Euler no longer wanted to renew or make material changes in the CreditMaster Policy it merely had to follow the Insurance Code's notice procedures, but did not do so.

Moreover, Euler, not the Debtor, sought material changes to the CreditMaster Policy. Euler admits that it did not provide the Debtor with a copy of the Domestic Markets Policy and admits that the Debtor had never seen the Domestic Markets Policy provisions prior to this litigation. *See* Undisputed Facts 36, 37. The Debtor could not request the coverage of the Domestic Markets Policy if it was unaware of the Policy's existence.

Euler admits that it did not comply with the notice provisions of Section 143.17a(a). The CreditMaster Policy was therefore extended under Section 5/143.17a(c) for one year, from November 30, 2001 to November 20, 2002. Therefore, the policy was in effect when the Kmart claim arose and was submitted.

### COVERAGE OF THE KMART CLAIM AND REQUEST FOR PARTIAL SUMMARY JUDGMENT

Section 5/143.17a(c) provides that if an insurer

"fail[s] to comply with the non-renewal notice requirements ... the policy shall be extended for an additional year or until the effective date of any similar insurance procured by the insured, whichever is less, on the same terms and conditions as the policy sought to be terminated."

■ 215 ILL. COMP. STAT. 5/143.17a(c) (2004). There was no showing whether or not the Debtor was covered by another insurer during the period of Kmart's insolvency and filing of the Kmart claim. Moreover, there are questions of coverage, damages, and statutory damages.

■ Partial summary judgment cannot be rendered unless that judgment disposes of one or more counts of the complaint or counterclaim. One cannot obtain a judgment stating that an opponent is liable without judgment on all elements of the claim. *Biggins v. Oltmer Iron Works*, 154 F.2d 214, 216 (7th Cir.1946); *S.N.A. Nut Co. v. Tulare Nut Co. (In re S.N.A. Nut Co.)*, 197 B.R. 642, 647 (Bankr.N.D.Ill. 1996); 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure, § 2737 (ed.1998 and Supp.2003).

Therefore, no partial judgment can be entered for Plaintiff.

■ However, a court may enter rulings as to specific issues without granting judgment as to an entire cause of action if that will narrow issues for trial. *Carillo v. Bridgestone/Firestone, Inc. (In re Bridgestone/Firestone, Inc.)*, 2002 U.S. Dist. LEXIS 8845 (U.S.Dist. May 13, 2002); *First Nat'l Ins. v. F.D.I.C.*, 977 F.Supp.

1051, 1055 (S.D.Cal.1997); 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure, § 2737 (ed.1998 and Supp.2003). Such has been done here.

### MOTION FOR JUDGMENT ON THE PLEADINGS AS TO COUNTS II AND IV

Euler contends that the Court should grant a judgment on the pleadings as to Counts II and IV for failure to state a claim. Def.'s Mem. Supp. Summary Judgment at 23. Counts II and IV allege breach of the CreditMaster Policy.

Since the November 12 and 13, 2001 notices did not cancel the CreditMaster Policy's coverage of the Kmart claim, the issue of Euler's possible breach of the Policy and the consequent remedies applicable under Illinois law remains unresolved. Euler's motion for judgment on the pleadings is denied.

### CONCLUSION

For the foregoing reasons, both cross-motions for summary judgment are denied, likewise the motion for judgment on the pleadings.

A separate order consistent with these rulings will be entered and Pretrial Order will be entered setting trial on the remaining issues which include: (1) whether the Debtor obtained replacement insurance during the period in which the Kmart claim arose; (2) whether the CreditMaster Policy covers the Kmart claim; (3) the amount of damages proven to result from the Kmart insolvency; (4) the amount of coverage provided for the Kmart claim in the Policy; and (5) the availability of statutory damages.

Pursuant to Rule 56(d) Fed.R.Civ.P. [rule 7056 Fed.R.Bank.R.], ¶¶ 1 through and including 59 of the Undisputed Materi-

al Facts set forth herein above are deemed established for trial and will be admitted into evidence.