AMELCO ELECTRIC COMPANY, INC., Plaintiff-Appellant, *v.* ARCOLE MIDWEST CORPORATION *et al.*, Defendants-Appellees.

First District (1st Division)    No. 62773

Opinion filed June 28, 1976.

Wilfred F. Rice, Raymond J. Kelly, and James F. Best, all of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellant.

Charles J. O'Laughlin and William D. Heinz, both of Jenner & Block, and Herbert Morton, of Concannon, Dillon, Snook & Morton, both of Chicago, for appellees.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

Amelco Electric Company, Inc. (plaintiff) appeals from a summary judgment entered against it and in favor of Arcole Midwest Corporation

and Allied Asphalt Paving Company (defendants). The judgment denied plaintiff's claim for a mechanics' lien upon public funds held by the City of Chicago as advanced in the first count of plaintiff's complaint.

Defendants' motion for summary judgment is supported by two affidavits. Plaintiff responded with two counteraffidavits. These documents and the balance of the record furnish the following factual background.

The City of Chicago contemplated improvement of certain runways at O'Hare Airport. Defendants formed a joint venture and submitted a general contractor's bid on the project. Prior to submission of their bid, defendants, on May 29, 1974, requested a subcontractor's bid by plaintiff for performance of certain portions of the work. Plaintiff received from the City detailed specifications and contract plans which included a "Specified Completion Time" schedule. About June 14, 1974, plaintiff submitted to defendants an oral bid of approximately $475,000 for performance of this work.

On or about June 14, 1974, defendants' bid for performance of the work as general contractor was accepted by the City. Thereafter various meetings were held between representatives of plaintiff and defendants on various dates until July 10, 1974. About July 10, 1974, defendants received a letter from the City bearing that date advising that the general contractor's job was to be let out to defendants, subject to certain specifications in defendants' bid. The letter advised defendants that they could proceed with the provisions of the specifications subject to the approval of the contract by the comptroller and mayor of the City and to the furnishing of a satisfactory performance bond.

By letter dated July 11, 1974, and received by plaintiff, defendants confirmed telephone advice to plaintiff of acceptance by the City of defendants' bid and sent plaintiff a copy of the letter from the City. Defendants' letter stated:

> "We will prepare the subcontracts within the next few days and should have yours in the mail the early part of next week.
>
> As per our previous conversations, I believe it advisable for you to now place your orders for all material needed for this contract."

The letter also advised plaintiff that the City of Chicago wished to approve products to be used by plaintiff prior to requesting priority from Federal authorities.

Commencing about July 12, 1974, plaintiff took certain steps to make itself ready to enter upon performance of the agreement. These steps, done with the knowledge of defendants, "consisted of ordering the necessary materials, preparing the necessary drawings and taking the necessary steps to obtain sufficient labor to implement its bid."

On July 15, 1974, plaintiff wrote to defendants' representative enclosing a copy of material indicating the proportion of the work expressed in total number of man-hours which would be performed by minority persons. This was stated by way of an appendix pertaining to performance of the contract in connection with plaintiff's bid and was executed by plaintiff, by its president.

On July 16, 1974, defendants wrote a letter to plaintiff which was received on the following day. This letter enclosed an original and three copies of a written subcontract agreement dated July 16, 1974, between defendants and plaintiff for performance of plaintiff's bid as subcontractor. This subcontract contained 28 detailed provisions expressed upon a printed form together with a typewritten rider containing the details of the work to be done for a total price of $479,995. Among other provisions, the subcontract provided for a performance bond in the amount of the agreement to be executed by corporate surety, indemnity by the subcontractor to the contractor, incorporation into the subcontract of every provision of the general contract; and, of material importance here, a specific waiver and release of all rights to mechanics' lien against funds due or to become due the contractor, and an agreement to indemnify the contractor against loss or expense including attorneys' fees in connection with claims or liens filed by or through the subcontractor. The letter transmitting the subcontract provided:

> "If this meets with your approval, will you please execute three copies of the agreement in the manner indicated and return them to us. We will then return one fully executed copy of the agreement for your file. Please be sure to execute the rider also."

The letter also enclosed the "Chicago Plan-Appendix A." for estimated man-hours to be worked by minority persons with the request that this document be completed and signed by plaintiff and returned to defendants for transmittal to the City of Chicago, "in order to have you approved as a subcontractor." The letter also enclosed an additional copy of the agreement to be forwarded by plaintiff to its insurance carrier and requested that plaintiff procure and send defendants certificates of insurance complying with the subcontract agreement. On this subject, the letter stated:

> "Insurance certificates should be in our hands as soon as possible. We will not be able to have you approved as a subcontractor until we send a copy of your certificate to the City of Chicago."

On July 20, 1974, representatives of plaintiff and defendants met and discussed performance of all of the work to be done under the general contract including that to be performed by plaintiff. Discussion was also held regarding sequence of the work and dates for performance. A "Critical Path Progress Schedule" reflecting work sequence and dates of

performance was prepared at this meeting. A further meeting between representatives of the parties and of the City of Chicago was held on July 26, 1974. The parties there agreed that actual work on construction would commence August 5, 1974. One of the counteraffidavits states that plaintiff did not agree to any time limitations on the project other than those in the City contract plans referred to as "Specified Completion Time."

On August 2, 1974, plaintiff moved equipment and the field offices to the performance site. Plaintiff commenced performance on August 5, 1974. On eight designated work days thereafter plaintiff caused to be prepared and submitted to the City written contractor's reports. These reports showed defendants as the prime contractor and plaintiff as a subcontractor. They reflect the number of individuals actually engaged on construction, their respective trades and the description of duties performed, together with equipment used. These reports are signed by plaintiff's superintendent.

On August 5, 1974, defendants addressed a letter to plaintiff which was received on August 6, 1974. This letter requested plaintiff's attention, as soon as possible, to the fact that defendants had not yet received the three executed copies of the subcontract agreement covering plaintiff's work on the project which had been sent to plaintiff on July 16 and also stated that defendants had not received the required performance bond. No response was ever made by plaintiff to defendants' letter of July 16, 1974, forwarding the subcontract for execution or to defendants' letter dated August 5, 1974, requesting attention to the matter as soon as possible. It does not appear that any negotiations or conversations of any kind were carried on between the parties or any of their representatives at any time regarding any of the terms or provisions of the contract document thus sent to plaintiff.

On August 5, 1974, when work had been commenced, a time schedule had been posted at the site but one of the counteraffidavits alleges that this schedule had not been agreed upon by plaintiff. Defendants' answer alleged that on August 14, 1974, defendants notified plaintiff by telegram that plaintiff was three days behind schedule on its performance of the contract as determined by the "Critical Path Progress Schedule." The answer also alleged that plaintiff fell five days behind the "Critical Path Progress Schedule" which placed defendants in jeopardy of a penalty of $10,000 per day. No reply appears to have been filed to defendants' answer. Defendants also filed a counterclaim seeking damages against plaintiff for alleged failure to perform its subcontract. Plaintiff answered the counterclaim and denied that it entered into the subcontract. Plaintiff also admitted that it thought it agreed to perform certain work in accordance with the "Specified Completion Time Schedule." It is agreed that performance continued by plaintiff until August 16, 1974, when by

written notice defendants terminated plaintiff's services and removed plaintiff from the project.

The above summarizes the facts which appear from the motion for summary judgment, the supporting affidavits and the counteraffidavits and from the balance of the record. Certain additional matters which appear from the counteraffidavits will be considered in a later portion of this opinion.

■■■ Summary judgment is proper, "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment or decree as a matter of law." (Ill. Rev. Stat. 1975, ch. 110, par. 57(3); *Heidelberger v. Jewel Companies, Inc.* (1974), 57 Ill. 2d 87, 92, 312 N.E.2d 601, and *Carruthers v. Christopher & Co.* (1974), 57 Ill. 2d 376, 380, 313 N.E.2d 457.) Where facts contained in the affidavits in support of a motion for summary judgment are not contradicted by counteraffidavit, such facts are admitted and must be taken as true. (*Heidelberger*, 57 Ill. 2d 87, 92, 93.) It has been stated with some frequency, "that the right to summary judgment must be free from doubt and determinable solely as a question of law and if there is a disagreement on any material fact or facts, the motion should be denied." (*Reith v. General Telephone Co.* (1974), 22 Ill. App. 3d 337, 339, 317 N.E.2d 369.) Consequently, "[i]t has been held that, while summary judgment is a procedure to be encouraged, it should be awarded with some caution so as not to preempt the right to a trial by jury or the right to present fully the factual basis for a case where a material dispute may exist." (*Anderson v. Dorick* (1975), 28 Ill. App. 3d 225, 227, 327 N.E.2d 541.) There is a distinction between affidavits in support of a motion for summary judgment and counteraffidavits. Supporting affidavits "must be strictly construed and must leave no question as to the right of the movant to judgment." Conversely, counteraffidavits "receive a liberal construction." *Watson v. Southwest Messenger Press* (1973), 12 Ill. App. 3d 968, 972, 299 N.E.2d 409.

In the case before us, we cannot find any genuine issue as to any of the material facts. It appears from both sets of affidavits with equal clarity that defendants made their bid for the main contract in due course and that plaintiff submitted an oral bid for the performance of the electrical work on a subcontract. The parties agree that the bid of defendants was accepted by the City of Chicago and the parties agreed verbally on acceptance of the bid made by plaintiff. It is agreed plaintiff participated in certain preliminary work such as furnishing the document with reference to participation of minority labor. In due course on July 6, 1974, defendants sent copies of the proposed written contract to plaintiff. Plaintiff commenced to prepare for the work and on August 5

commenced the actual performance of the subcontract. On August 5, 1974, in a letter received by plaintiff on the next day, defendants demanded execution and return of the subcontract. Admittedly defendants sent and plaintiff received a copy of the proposed subcontract in connection with the performance bond. It is conceded that no objection was ever expressed by plaintiff, either verbally or in writing, to any of the provisions in the proposed form of subcontract which contains a specific waiver of mechanics' liens by plaintiff.

It is also clear that plaintiff's participation in the project was terminated by defendants on August 16, 1974. This appears from the affidavits of both parties as well as from the undenied allegations of various counts in plaintiff's complaint. The issue between the parties is not that there was a termination but whether this action by defendants was legally justifiable. It should be noted that plaintiff's complaint consists of four counts. Count I seeks only a mechanics' lien upon funds which had been held by the City of Chicago in connection with payment of the cost of the project. (See Ill. Rev. Stat. 1975, ch. 82, par. 23.) Count II seeks damages for breach of a binding subcontract between the parties. Count III seeks damages upon a theory of quantum meruit. Count IV seeks damages for loss to plaintiff's reputation and goodwill because of alleged wrongful termination of plaintiff's services. Since the summary judgment was entered by the trial court only upon Count I involving enforcement of a mechanics' lien, it is manifest that the merits of the remaining litigation between these parties are not before us. The issue as to whether the termination of plaintiff's services was proper or wrongful, depending in turn upon whether the parties agreed upon the "Critical Path Schedule" or the "Specified Completion Time Schedule," may be material upon trial of the remaining portions of plaintiff's complaint but it is not a material fact in connection with this appeal which involves simply and only plaintiff's right to a mechanics' lien upon public funds.

We also note here various allegations of the counteraffidavits upon which plaintiff depends as raising genuine issues of material fact. The counteraffidavit of James A. Brown, president of plaintiff corporation, states that because defendants did not sign the proposed subcontract agreements forwarded to plaintiff, plaintiff "assumed the terms of any comprehensive agreement would be subject to negotiation." The counteraffidavit further stated that, "It is not uncommon to commence work at a job site on the basis of an accepted bid and work out the terms of a more comprehensive agreement at a later date." The counteraffidavit also stated that plaintiff, "was led to assume" that the main concern of defendants was implementation of plaintiff's bid and that the details of "a comprehensive agreement would be worked out mutually in the future."

The counteraffidavit by Robert E. Lane, an estimator and project

manager for plaintiff, contains a statement that, "representations and conduct of representatives from the Joint Venture [defendants] led Amelco [plaintiff] to assume that implementation of Amelco's bid was the only concern of the parties and that all other matters would be mutually worked out at some later date."

■■ The form of affidavits in support of and in opposition to a motion for summary judgment is governed by Supreme Court Rule 191(a). (Ill. Rev. Stat. 1975, ch. 110A, par. 191(a).) These documents, "shall not consist of conclusions but of fact admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto." These portions of the counteraffidavits above noted are pure conclusions which are patently insufficient to raise material factual issues. (See *Carruthers v. Christopher & Co.* (1974), 57 Ill. 2d 376, 380, 313 N.E.2d 457, and authorities there cited on this point; also *Clausen v. Ed Fanning Chevrolet, Inc.* (1972), 8 Ill. App. 3d 1053, 1056, 291 N.E.2d 202, *leave to appeal denied,* 53 Ill. 2d 607.) We, therefore, have concluded that there are no material issues of disputed fact presented to us by this record. The sole issue is one of law as to whether, under all of the facts and circumstances above detailed, plaintiff is bound by the subcontract in question even though it has not been signed.

The thorough briefs presented by both sides of the controversy cite a great number of authorities. It is unnecessary and hardly possible to consider all of these cases in detail. The principle has been described as "well settled" as a general matter of contract law, that "a party named in the contract may by his acts and conduct become bound by its provisions even though he has not signed it." *Soelzer v. Soelzer* (1943), 382 Ill. 393, 399, 47 N.E.2d 458; *Stuckrath v. Briggs & Turivas* (1928), 329 Ill. 555, 562, 161 N.E. 91, and *Calo, Inc. v. AMF Pinspotters, Inc.* (1961), 31 Ill. App. 2d 2, 10, 11, 176 N.E.2d 1.

In *Soelzer,* the Supreme Court held that an adopted child could enforce a written agreement for adoption which had been duly executed by a social agency but never signed by the adopting parents. After the death of these parents, the court permitted inheritance by the adopted child as sole heir of the deceased. After stating the general principle above set forth, the Supreme Court stated, "We perceive no reason why this principle of law should not, where the evidence warrants, be applied to contracts for adoption." (382 Ill. 393, 399.) In *Stuckrath,* the Supreme Court granted specific performance of a contract for sale of real estate even though it had not been signed by all of the parties. The court held that, "Where a party accepts or acts upon a contract in writing, it is effective as to him even though he does not sign it." (329 Ill. 555, 562.) Subsequently, in *Calo, Inc.,* this court dealt with a suit in contract for purchase of certain items of bowling equipment and rental of others. This court enforced the contract

even though it had not been signed by the parties. In reaching this conclusion, the court quoted from *Soelzer* the principle above set forth and reviewed a number of cases in accord from other jurisdictions.

■■ We are constrained to apply the same legal principle to the situation before us. There is no conflict in the affidavits concerning the fact that the written contract and other documents were mailed to plaintiff and duly received; sometime later a written demand was made upon plaintiff for return of the executed contract, these matters were ignored by plaintiff; plaintiff never made any objection, verbal or written, to the agreement or any terms thereof; plaintiff acted upon the contract by various activities before the document was received and by starting actual performance after its receipt thereof; plaintiff completed and returned to the City the necessary papers pertaining to compliance with regulations for employment of minority persons and on eight separate days plaintiff submitted written contractor's reports to the City in accordance with the written agreement. This strong factual situation cannot be overcome by the pure conclusion in a counteraffidavit that between the receipt of the contract and date of termination by defendants, "Amelco [plaintiff] had made the decision to take exception to some of the terms and provisions of the Subcontract Agreements which included Paragraph 20 [waiver of mechanics' liens]." Not only is this statement a pure conclusion, as above pointed out with reference to other portions of the counteraffidavits, but it reflects a subjective and unilateral decision made by plaintiff which was apparently never communicated to defendants in any manner.

We must reiterate that the decision of this phase of the case which is before us has no bearing upon the rights of the parties concerning plaintiff's attempt to enforce the contract in the remaining counts of its complaint. If upon trial the evidence shows that plaintiff's performance of the contract was wrongfully terminated, determination of damages flowing from any breach will undoubtedly be made in due course but this will not be necessary if it appears that the termination was legally justified. The summary judgment appealed from is, therefore, affirmed.

Judgment affirmed.

SIMON and O'CONNOR, JJ., concur.