SIXTH DIVISION
August 20, 2010

No. 1-09-2631

| | |
|---|---|
| ALL AMERICAN ROOFING, INC., | ) Appeal from |
| | ) the Circuit Court |
| Plaintiff-Appellant, | ) of Cook County |
| | ) |
| v. | ) 07 CH 37425 |
| | ) |
| ZURICH AMERICAN INSURANCE COMPANY, | ) Honorable |
| | ) Peter Flynn, |
| Defendant-Appellee. | ) Judge Presiding. |

JUSTICE McBRIDE delivered the opinion of the court:

The plaintiff company was summoned to arbitration by its workers' compensation insurer about unpaid deductibles and retrospective premiums totaling $747,093. It responded by filing this declaratory judgment action, contending the mandatory arbitration clause the insurer was relying upon was unenforceable due to the insurer's conduct at the time of contracting. The plaintiff's second amended complaint included claims of common law and statutory fraud (815 ILCS 505/2 (West 2000)); breach of contract; lack of consideration; violation of Illinois public policy; and failure to give adequate notice of new coverage terms in a renewal policy (215 ILCS 5/143.17a (West 2000)). The court stayed the arbitration, but subsequently dismissed or entered summary judgment against most of the plaintiff's claims, resolved the remaining issues through an evidentiary hearing, and then directed the parties to arbitrate their dispute. The plaintiff-employer appeals.

The plaintiff-employer is All American Roofing, Inc., a company that specializes in the installation of commercial and residential building exteriors and roofs and is based in Lake Zurich, Illinois. It obtained workers' compensation and employer's liability insurance from

defendant-insurer Zurich American Insurance Company, of Schaumburg, Illinois, for the policy years beginning March 1, 2001, through March 1, 2005. The 2001, 2002 and 2003 insurance policies were subject to retrospectively rated premiums, meaning the employer would reimburse the insurer from time to time after the policy year ended, based on claims arising during the policy year. The 2004 policy did not have a retrospective premium; instead, it had an endorsement providing that the employer would pay a large deductible. The employer obtained this coverage with the assistance of its insurance agent, the Columbian Agency, of New Lenox, Illinois, a large and well-established insurance broker. Additional details will be set out below as they become relevant.

The employer first argues that during the circuit court proceedings the insurer waived its right, if any, to compel arbitration of the 2001 and 2002 policies when it asked the court to declare a New York choice-of-law clause enforceable. The employer contends a party waives a contractual right to require arbitration of disputes where its conduct is inconsistent with the arbitration language it is relying upon and that asking a court to decide an issue on the merits is not consistent with a desire to arbitrate. *Glazer's Distributors of Illinois, Inc. v. NWS-Illinois, LLC*, 376 Ill. App. 3d 411, 425, 876 N.E.2d 203, 215 (2007); *Feldheim v. Sims*, 326 Ill. App. 3d 302, 312, 760 N.E.2d 123, 132 (2001).

Illinois courts favor arbitration to resolve disputes and disfavor finding a wavier of arbitration rights, due to the fact that arbitration allows for "an easier, more expeditious and less expensive [disposition of disputes] than [does] litigation." *Feldheim*, 326 Ill. App. 3d at 309, 760 N.E.2d at 215; *Glazer's*, 376 Ill. App. 3d at 425, 876 N.E.2d at 215 (waiver of arbitration

rights will not be lightly inferred). The employer limits its waiver argument to the 2001 and 2002 policies because the New York clause does not appear in the documents regarding coverage in 2003 and 2004.

The insurer's initial response is that this argument should be disregarded because it is inadequately presented. Although we agree that the employer has ignored numerous appellate rules and that the brief as a whole is confusing and incomplete, we address the merits instead of disposing of the argument on technical grounds.

The record on appeal discloses that the employer's first argument misstates the procedural history of the case. The insurer never asked the court to declare the New York choice-of-law clause enforceable. Rather, the insurer asked the court to dismiss the employer's allegations that the clause was unenforceable. In count IX of the pleading, entitled "Choice of Law Provision is Void as Against Public Policy," the employer alleged the clause should be voided on public policy grounds because it had no reasonable relationship to the parties or their transaction and would defeat the employer's rights under Illinois' insurance and consumer protection statutes. The insurer responded that count IX should be dismissed because its domicile in New York provided a sufficient relationship between that foreign state and the parties and because Illinois courts routinely enforce such clauses even where the foreign state's statutes are different or leave the plaintiff with no recourse. The employer has also mischaracterized the circuit court's ruling by contending the court "improperly addressed the merits of that issue," when its supporting record citation is to the order dismissing, rather than deciding, the choice-of-law count. The hearing transcript includes the court's conclusion that "under the arbitration clause the New York

choice of law issue I think would properly speaking go to the arbitrators."[1]  Thus, the dismissal order and transcript reflect that the choice-of-law issue remains open for arbitration or settlement between the parties.

Furthermore, the insurer's argument for dismissal of count IX was consistent with the desire to arbitrate and it differs from the cases cited by the employer in which a party showed an interest in arbitration only after finding the courts inhospitable.  In *Glazer's*, the party hoping to rely on an arbitration clause was the party that initiated the litigation and, "in fact, sought *complete* relief" from the courts, without making any mention of alternative dispute resolution. (Emphasis in original.)  *Glazer's*, 376 Ill. App. 3d at 426, 876 N.E.2d at 216.  After the party was denied a temporary restraining order, lost an interlocutory appeal, and was faced with a motion to dismiss its complaint, it started proceedings before the American Arbitration Association. *Glazer's*, 376 Ill. App. 3d at 426, 876 N.E.2d at 216.  The court characterized the maneuver as patent "impermissible forum shopping" and found the party had previously abandoned any arbitration right when it chose to sue and pursue full relief in the courts.  *Glazer's*, 376 Ill. App. 3d at 426, 876 N.E.2d at 216.

---

[1]  The court also remarked "if this court decides that [the arbitration clause is] valid, then the [question of the validity of the] New York choice of law [clause will go] off to the arbitrators," where the same evidence would be repeated.  The court pointed out that the outcome of two separate proceedings was unpredictable, stating, although "I don't know how one could responsibly come to a different conclusion with regard to the [same evidence]," potentially, "these two things are marching *** down divergent paths."

In *Feldheim*, the defense asserted its purported right to alternative dispute resolution only after its motion to dismiss the first amended complaint was rejected. *Feldheim*, 326 Ill. App. 3d 302, 760 N.E.2d 123. Nine days after losing the argument, the defense proposed for the first time that the parties make their way to alternative dispute resolution, causing the appellate panel to remark, "[t]he law does not permit [parties] to forum shop until they receive the [desired result]." *Feldheim*, 326 Ill. App. 3d at 308, 313, 760 N.E.2d at 128, 132.

In contrast, here, the party that purportedly waived any right to arbitrate is the party that instituted arbitration proceedings in the first place and then resisted the other party's attempt to move the disagreement into the court system. It filed a motion to dismiss in order to protect its right to arbitration. Its motion was merely responsive to the pleading. It has consistently argued the parties' dispute does not belong in the courts. Accordingly, we conclude that the insurer's conduct in the circuit court did not result in waiver of the arbitration clause.

Continuing to confine its attention to the 2001 and 2002 policy years, the employer next argues the choice-of-law and arbitration language is unenforceable because of how and when it was incorporated into the parties' relationship. The pertinent facts are as follows. The 2001 policy was in effect for one year beginning March 1, 2001, and the 2002 policy was in effect for one year beginning March 1, 2002. Shortly after the 2001 original policy expired and the 2002 renewal policy was bound, the insurer sent a letter to the employer's insurance agent, the Columbian Agency, on March 21, 2002, demanding that the employer execute an incurred loss retrospective rating agreement for the 2001 policy year and a letter demanding that it execute an incurred loss retrospective rating agreement for the 2002 policy year. The employer contends

Columbian Agency asked the insurer why these new documents were necessary, was told the rating agreements were formalities which " 'mirrored' " existing 2001 and 2002 retrospective premium endorsements, when in fact they added the objectionable clauses, and the employer relied on this false representation when it signed the rating agreements on March 21, 2002.

With these facts in mind, the employer first argues the arbitration clause was a material alteration to the 2001 policy "coverage," which means the insurer was required by statute to give notice it was not renewing the original "coverage," and because it failed to give notice, the new clause could not legally take effect. In the third section of its brief, the employer repeats this argument, but directs it at the choice-of-law clause. We construe these arguments as a request to reverse the circuit court's dismissal with prejudice of count XII of the first amended complaint pursuant to section 2-619.1 of the Code of Civil Procedure. 735 ILCS 5/2-619.1 (West 2000). The employer repled the theory as count XII of the second amended complaint in order to preserve the issue for appeal. The notice statute the employer relies upon provides:

"§143.17a. Notice of intention not to renew.

a. No company shall fail to renew any policy of insurance, to which Section 143.11 applies, except for those defined in subsections (a), (b), (c), and (h) of Section 143.13, unless it shall send by mail to the named insured at least 60 days advance notice of its intention not to renew. ***

b. This Section does not apply if the company has manifested its willingness to renew directly to the named insured.

Provided, however, that no company may increase the renewal premium on [certain policies] *** by 30% or more, nor impose changes in deductibles or coverage that materially alter the policy, unless the company shall have mailed or delivered to the named insured written notice of such increase or change in deductible or coverage at least 60 days prior to the renewal or anniversary date. *** The company shall maintain proof of mailing or proof of receipt whichever is required.

c. Should a company fail to comply with the notice requirements of this Section, the policy shall terminate only as provided in this subsection. In the event notice is provided at least 31 days, but less than 60 days prior to expiration of the policy, the policy shall be extended for a period of 60 days or until the effective date of any similar insurance procured by the insured, whichever is less, on the same terms and conditions as the policy sought to be terminated. In the event notice is provided less than 31 days prior to the expiration of the policy, the policy shall be extended for a period of one year *** on the same terms and conditions ***." 215 ILCS 5/143.17a (West 2000).[2]

---

[2] The statute has been reworded by legislation that took effect in 2003 and 2005. See Pub. Act 93-477, §5, eff. August 8, 2003; Pub. Act 93-713, §5, eff. January 1, 2005.

1-09-2631

The employer emphasizes that the insurer sent the 2001 rating agreement to Columbian Agency after the original policy was expired and less than 31 days prior to the new policy year in 2002, and argues this brings the renewal within the time frame stated in the statute. Citing *Perry v. Economy Fire & Casualty Co.*, 311 Ill. App. 3d 69, 70, 724 N.E.2d 151, 152 (1999), the employer also contends that because the insurer was required to spell out the changes in "coverage," the employer was under no obligation to review the rating agreements it executed. Thus, indirectly, the employer is arguing it is not bound by its signatures.

The insurer responds that the circuit court properly rejected the employer's argument for numerous reasons, including that the ordinary and plain meaning of "coverage" as used in the statute does not encompass arbitration or choice-of-law terms and because *Perry* is an irrelevant case that addresses a reduction of coverage. *Perry*, 311 Ill. App. 3d 69, 724 N.E.2d 151.

We find the insurer's response compelling. Statutory construction is an issue of law we address *de novo*. *Gallagher v. Union Square Condominium Homeowner's Ass'n*, 397 Ill. App. 3d 1037, 1041, 922 N.E.2d 1201, 1205 (2010). When construing a statute, our role is to give effect to the legislature's intent. *Gallagher*, 397 Ill. App. 3d at 1041, 922 N.E.2d at 1205. The best indicator of the legislature's intent is the plain and ordinary meaning of the statute's language. *Gallagher*, 397 Ill. App. 3d at 1041, 922 N.E.2d at 1205-06. When a statute is clear and unambiguous, a court must give effect to the plain and ordinary meaning of the language. *Gallagher*, 397 Ill. App. 3d at 1041, 922 N.E.2d at 1206. The plain terms of the quoted statute require advance notice to an insured only where the insurer (1) increases a renewal *premium* by 30% or more, (2) imposes changes in *deductibles* that materially alter the policy, or (3) imposes

8

changes in *coverage* that materially alter the policy. We acknowledge that it could be argued the term "coverage" refers broadly to an insurance policy and the fact that the parties are vigorously challenging the validity of the arbitration and choice-of-law clauses demonstrates that they are material, significant contract terms. However, the legislature signaled a more specific meaning to "coverage" when, within the context of the Insurance Code (215 ILCS 5/1 *et seq.* (West 2000)), it specified material alterations to three aspects of an insurance policy: its premium, its deductibles, and its coverage. If the legislature had intended the broader meaning of "coverage," it would have omitted "premiums" and "deductibles" from the statutory section, and effectively swept in all material alterations to insurance policies. The courts' role is to apply statutes as they are written by the legislature and we may not render terms superfluous or read in exceptions or limitations that conflict with the express legislative intent. *Gallagher*, 397 Ill. App. 3d at 1041-42, 922 N.E.2d at 1206. "Coverage" as it was used in this context refers to the risks that come within the scope of the policy. Black's Law Dictionary 372 (7th ed. 1999) (defining "coverage" as "the risks within the scope of an insurance policy"); Webster's Unabridged Dictionary 466 (2d ed. 1998) (defining "coverage" in the context of insurance as "protection provided against risks or a risk"); *In re S.M. Acquisition Co.*, 309 B.R. 520 (Bankr. N.D. Ill. 2004) (applying section 143.17a where insurer attempted to reduce coverage for prior shipments from $3 million to $1 million and eliminate coverage for future shipments); *Elson v. State Farm Fire & Casualty Co.*, 295 Ill. App. 3d 1, 691 N.E.2d 807 (1998) (applying section 143.17a where original policy contained coverage for water damage from sewer or drain backup and subsequent policies did not). See also *Gallagher*, 397 Ill. App. 3d at 1042, 922 N.E.2d at 1206 (relying on dictionary to

9

interpret key statutory term). The clauses at issue here did not change the risks that were insured against. They had no effect on the insurer's exposure to liability. Therefore, they did not alter "coverage" and did not implicate the statute.

The employer maintains that the court took a more expansive view of the statute in *Guillen*, when it determined that "a material modification to an insurance policy is one that makes significant changes to that policy," and "[a] material alteration of an insurance policy is an important transaction that may have a serious effect on the interests of the insured." *Guillen v. Potomic Insurance Co. of Illinois*, 203 Ill. 2d 141, 153, 785 N.E.2d 1, 9 (2003). The employer contends the clauses at issue materially affect its ability to dispute mishandled workers compensation claims and that mishandled claims have a direct impact on its premiums under a retrospective rating plan. See *National Surety Corp. v. Fast Motor Service, Inc.*, 213 Ill. App. 3d 500, 505-06, 572 N.E.2d 1083, 1087 (1991) (recognizing a cause of action for breach of an insurer's duty of good faith where it fails to act reasonably when adjusting claims under a policy with retrospective premiums, in part because under this type of plan the failure "automatically subjects the insured to *** increased premium rates"). *Guillen*, however, interpreted statutory language which is irrelevant here regarding "proof of mailing," and the "material modification" at issue was the insurer's attempt to add an exclusion to *coverage* for exposure to lead-based paint. *Guillen*, 203 Ill. 2d 141, 785 N.E.2d 1. Thus, *Guillen* is consistent with the statute, but not helpful here.

The employer also reaches to Texas for an opinion stating "Insurance 'coverage' is susceptible to a range of interpretations." *Hammerman & Gainer, Inc. v. Bullock*, 791 S.W.2d

330 (Tex. App. 1990). In that case, the court discussed the possibilities before concluding as we have that the "reasonable" definition of "coverage" is the most narrow one: the extent of the "risk of liability." *Hammerman*, 791 S.W.2d at 333. Therefore, the Texas opinion actually works against the employer.

Furthermore, the employer's reliance on *Perry* is misplaced. *Perry*, 311 Ill. App. 3d 69, 724 N.E.2d 151. That case indicates the statute at issue codified the common law principles that an insured bears the burden of knowing the contents of an original, newly issued insurance policy, but is not required to search the fine print of each renewal policy, and the burden shifts to the insurer to adequately inform its clients of changes to the coverage provided by the expiring policy. *Perry*, 311 Ill. App. 3d at 70, 724 N.E.2d at 152; *Elson*, 295 Ill. App. 3d at 7, 691 N.E.2d at 812 ("The general rule is that when a policy renewal is made, *unless provided otherwise*, the terms of the original policy become part of the renewal contract of insurance" (emphasis in original)). The employer quotes *Perry* for the proposition that the insurer owed a common law duty to notify its insured of changes to "the policy." *Perry*, 311 Ill. App. 3d at 70, 724 N.E.2d at 152. However, further reading discloses that *Perry*'s insurer tried to materially alter *coverage* at the time of renewal by adding an exclusion for exposure to lead-based paint (*Perry*, 311 Ill. App. 3d at 70, 724 N.E.2d at 152), and the court determined, as a matter of law, that the insurer's notices were insufficient to change the protection provided by the original policy. *Perry*, 311 Ill. App. 3d at 72, 724 N.E.2d at 154.

In our opinion, the clauses at issue regarding arbitration and choice of law did not change the policy's "coverage," and therefore did not implicate the statute, and since *Perry* simply

11

interprets the statute, it adds nothing to the argument on appeal. Another significant distinction is that the attempted contract modification in *Perry* was unilateral, but the current parties mutually agreed in writing to what they both call "side agreements or contracts" to their insurance arrangement. See *Brayman Construction Corp. v. Home Insurance Co.*, 319 F.3d 622, 623-24 (3d Cir. 2002) (enforcing arbitration clause where employer purchased workers' compensation policy and "[t]he parties subsequently entered into a separate retrospective premium agreement" which, among other things, added an arbitration clause but did not " 'modify, alter, or amend any of the terms or conditions of the Policies relating to the insurance afforded thereunder' "). *Perry* does not speak to the current situation and does not indicate the statute is applicable to the facts here.

Furthermore, a contracting party is not obligated to advise the other party of the contents of the agreement they are signing. In fact, there is authority to the contrary. In *Belleville National Bank*, for instance, a professional real estate broker and his wife contended they did not read various promissory notes before signing them and that their mortgage lender made false, oral statements about key terms of the loans. *Belleville National Bank v. Rose*, 119 Ill. App. 3d 56, 57-58, 456 N.E.2d 281, 282-83 (1983). The trial court rejected the couple's fraud defense and was affirmed on appeal due to an "elementary principle of contract law":

> " 'One is under a duty to learn, or know, the contents of a
> written contract before he signs it, and is under a duty to determine
> the obligations which he undertakes by the execution of a written
> agreement. [Citation.] And the law is that a party who signs an

> instrument relying upon representations as to its contents when he
> has had an opportunity to ascertain the truth by reading the
> instrument and has not availed himself of the opportunity, cannot
> be heard to say that he was deceived by misrepresentations.' "
> *Belleville National Bank*, 119 Ill. App. 3d at 59, 456 N.E.2d at 284,
> quoting *Leon v. Max E. Miller & Son, Inc.*, 23 Ill. App. 3d 694,
> 699-700, 320 N.E.2d 256, 260 (1974).

The principle was reiterated in *Nilsson v. NBD Bank of Illinois*, 313 Ill. App. 3d 751, 763, 731 N.E.2d 774, 783 (1999), when the court refused to make an exception for a demand note signator who (a) had opportunity to read promissory notes and discover a discrepancy from the lender's oral representations and (b) was an experienced businessman and borrower. We do not mean to suggest that the principle is applied only to sophisticated business people or entities such as the professionals in *Belleville* and *Nilsson* and the current multistate employer. The principle has been applied to a farming couple near the small town of Warren, Illinois, that executed a contract to sell all but 5 acres of their 116-acre farm. *Hintz v. Lazarus*, 58 Ill. App. 3d 64, 373 N.E.2d 1018 (1978). The couple asked the court to void the contract on the grounds that the buyer told them they did not need an attorney, they were receiving $80,000, and that other contract terms would not be enforced or were favorable to them, even though the written contract specified a purchase price of $50,000 and the other terms advantaged the buyer. *Hintz*, 58 Ill. App. 3d at 66, 373 N.E.2d at 1019. The couple testified they did not read the contract before they signed it and became dissatisfied with it later, after they read it. *Hintz*, 58 Ill. App. 3d at 66, 373 N.E.2d at

13

1-09-2631

1019. The court declined to assume a paternalistic role, stating:

> "Short of appointing a conservator, there is generally little that courts can do to protect persons who are prone to signing contracts without reading them from the natural consequence of their folly, the law being that a party who is afforded an opportunity to read a contract prior to signing but signs a contract without reading it cannot be heard to say he was deceived by its contents." *Hintz*, 58 Ill. App. 3d at 66, 373 N.E.2d at 120.

Another helpful example is *Nathan v. Leopold*, 108 Ill. App. 2d 160, 170, 247 N.E.2d 4, 9 (1969), which concerned a complicated stock transaction and a party who signed various contracts when a lawyer, not his lawyer, brought the documents to his office and laid them out for signature. While the man was "busily engaged in making and receiving numerous telephone calls," he thumbed through the documents, asked about their contents, and was purportedly misinformed. *Nathan*, 108 Ill. App. 3d at 170, 247 N.E.2d at 9. He was not represented by an attorney at any stage of the negotiations or when he executed the documents. *Nathan*, 108 Ill. App. 3d at 170-71, 247 N.E.2d at 9. The deal turned out poorly for him: he had agreed to unconditionally indemnify the stock buyers and was sued to make up the difference between their $15 purchase price per share and the $4 market price per share, on 14,000 shares. *Nathan*, 108 Ill. App. 3d at 170-71, 247 N.E.2d at 9. One of his defenses was that the lawyer's incorrect representations induced him to sign the indemnification agreement. *Nathan*, 108 Ill. App. 3d at 170, 247 N.E.2d at 9. The circuit court rejected this defense as a matter of law and the appellate

14

1-09-2631

court affirmed the ruling, concluding:

> "Whether [he] was induced by [the lawyer's]
> representations or not, the law is that a party who signs an
> instrument relying upon representations as to its contents when he
> has an opportunity to ascertain the truth by reading and does not
> avail himself of the opportunity, cannot be heard to say that he was
> deceived by misrepresentations. [Citation.] [He] had ample
> opportunity to read [the agreement containing the unfavorable
> terms] and as his brief argues, [the attorney] was not his attorney,
> thus dispelling any notion that he might have been justified in
> relying on [the] representations. [His] original intentions, if
> otherwise, were thus frustrated by his own negligence and not
> through any misrepresentations." *Nathan*, 108 Ill. App. 3d at 171,
> 247 N.E.2d at 9.

Accord *Preston A. Higgins & Co. v. Stevenson*, 28 Ill. App. 3d 150, 153, 328 N.E.2d 79, 81 (1975) ("Mature adults have a duty to be fully advised as to the nature of the contents of a binding agreement").

Based on the foregoing, we reject the proposition that the insurer violated a statutory duty to inform the employer of changes in insurance "coverage." The facts and law lead us to reject the primary argument on appeal and conclude the circuit court properly dismissed the statute-based claim.

15

1-09-2631

The employer next argues the choice-of-law provision in the 2001 and 2002 rating agreements is unenforceable because of the absence of the essential element of consideration to make out an enforceable contract. This theory was pled as count II of the first amended complaint, which was dismissed for failure to state a claim and then repled as count II of the second amended complaint to preserve the issue for appeal. The insurer responds that the New York clause is just one of the clauses in the 2001 and 2002 program agreements, there was adequate consideration for the program agreements, and there is no factual or legal basis for isolating an individual contract clause and voiding it for lack of consideration.

We again find the insurer's argument compelling. An "enforceable contract is an exchange and its elements include offer, acceptance, and consideration." *Vassilkovska v. Woodfield Nissan, Inc.*, 358 Ill. App. 3d 20, 26, 830 N.E.2d 619, 624 (2005). "Consideration" is defined as a bargained-for exchange, whereby one party receives a benefit or the other party suffers a detriment. *Vassilkovska*, 358 Ill. App. 3d at 26, 830 N.E.2d at 624. A contract modification must satisfy the same elements for a valid contract (offer, acceptance, and consideration) and preexisting obligations do not suffice for consideration. *Watkins v. GMAC Financial Services*, 337 Ill. App. 3d 58, 64, 785 N.E.2d 40, 44 (2003). Nevertheless, the parties were free to agree at any time to arbitrate disputes arising from their contract, even if the contract had expired and a controversy had arisen. See 710 ILCS 5/1 (West 2006) (agreements to submit existing or future controversies to arbitration are valid and enforceable); *Brayman Construction*, 319 F.3d 622 (after workers' compensation insurance policy was issued, parties entered into separate retrospective premium agreement which added arbitration clause to parties'

16

relationship). Thus, the timing of the rating agreements, as separate contracts after the original insurance policy had expired and the first renewal policy was bound, is not problematic. Moreover, the insurer lists various benefits the employer received by signing the rating agreements, which include the provision of audits and premium adjustments based on audited exposures, the establishment of a procedure and 60-day time line to address payment disputes, and the insurer's obligation to arbitrate. The insurer points out that a mutual promise to arbitrate is considered sufficient consideration for an arbitration clause (*Bishop v. We Care Hair Development Corp.,* 316 Ill. App. 3d 1182, 1198, 738 N.E.2d 610, 622 (2000)) and there is no requirement that contracting parties exchange equivalent values. Restatement (Second) of Contracts §79 (1981). The insurer argues its agreement to arbitrate is sufficient consideration for the list of benefits the employer received. The employer does not disagree with the list of benefits it purportedly received by signing the agreements, but asks us to conclude that the consideration was "one sided" and that the insurer's response is "nonsensical." We reject this claim and affirm the dismissal of the count alleging inadequate consideration.

The court also dismissed counts VIII, IX, XI, XII, XIII, and XIV, but the employer is not challenging those findings.

Shifting its focus from the insurer's motion to dismiss the pleading to the insurer's motion for summary judgment on the remaining counts of the second amended complaint, the employer next contends the arbitration and choice-of-law clauses are unenforceable for the 2001 and 2002 policy years because the insurer engaged in common law fraud (count VI), consumer fraud or unfair business practices (count VII), or procedurally unconscionable means (count X) to

obtain the employer's signature on them. More specifically, the insurer is said to have falsely represented to the Columbian Agency that the terms of the rating agreements " 'mirrored' " the terms of the existing contracts and were merely formalities. The employer asks us to reverse the entry of summary judgment and return the case to the circuit court where it may be litigated on the merits.

The insurer responds that the common law fraud allegations fail because the employer could not show the elements of such a claim, particularly a knowingly false statement by the insurer.

Summary judgment is appropriately granted where the pleadings, deposition transcripts, admissions, and affidavits on file demonstrate there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill. App. 3d 642, 648, 762 N.E.2d 1, 6 (2001). The court is to construe all the evidence before it strictly against the moving party and liberally in favor of the nonmoving party. *Miller*, 326 Ill. App. 3d at 648, 762 N.E.2d at 6. This court considers the pleadings and evidence *de novo* and will reverse the circuit court's decision if it is shown that a material issue of fact exists or that the summary judgment was based on an erroneous interpretation of the law. *Miller*, 326 Ill. App. 3d at 648, 762 N.E.2d at 6. If a party moving for summary judgment supplies facts that, if left uncontradicted, would entitle him to judgment, the opposing party may not rely on her pleadings alone to raise issues of material fact. *Forsberg v. Edward Hospital & Health Services* 389 Ill. App. 3d 434, 441-42, 906 N.E.2d 729, 735 (2009). The presumption is that all persons are honest (*Allensworth v. Ben Franklin Savings & Loan Ass'n*, 71 Ill. App. 3d 1041, 1043-44,

389 N.E.2d 684, 687 (1979)), and allegations of common law fraud must be established by clear and convincing evidence. *Cwikla v. Sheir*, 345 Ill. App. 3d 23, 801 N.E.2d 1103 (2003). Common law fraud consists of (1) a false statement of material fact as opposed to opinion, (2) the speaker's knowledge or belief that the statement was false, (3) the speaker's intent that the statement induce the recipient to act, (4) the recipient's belief and reliance on the statement and right to do so, and (5) damage resulting from the reliance. *Miller*, 326 Ill. App. 3d at 648, 762 N.E.2d at 7; *Allensworth*, 71 Ill. App. 3d at 1043-44, 389 N.E.2d at 687. In *Miller*, for instance, a Chevrolet dealer told a consumer that a one-year-old car was a "great car" and "executive driven," when it had actually been retired from the fleet of a national rental car agency. *Miller*, 326 Ill. App. 3d at 647, 762 N.E.2d at 5.

The employer fails to identify any evidence in the record that Tony Shelby, the underwriter responsible for the employer's account, made the statement at issue knowing or believing it to be untrue. For instance, there are no personal notes, company memorandum, or internal email to that effect. Because Shelby died during the 2002 policy year, he was not available for deposition or affidavit regarding this dispute. R. Lee McWethy, the Columbian Agency employee who conversed with Shelby and relayed the statement to the employer, indicated at a deposition in 2008 that Shelby was an "[h]onest guy" and a "straight shooter," and that McWethy did not believe Shelby "had any intent to mislead [McWethy] in any way" or "intended to defraud [the insured] in any way, shape or form." We do not see how the employer could establish that Shelby knew or believed he was making a false statement of material fact. Accordingly, we reject the employer's conclusion that there was sufficient evidence of fraud to

oppose the insurer's motion for summary judgment.

The employer also fails to identify any material issue regarding the insurer's alleged violation of section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, which prohibits deceptive acts or practices in the course of trade or commerce with the intent that others rely upon them. 815 ILCS 505/2 (West 2000); *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 148, 776 N.E.2d 151, 159 (2002). The employer asks us to conclude "Shelby intended for [the employer] to rely on his communications to its broker McWethy," but once again, the employer fails to support its opinion with a deposition transcript, an affidavit, or any other document in the record on appeal which could arguably sustain this conclusion. Accordingly, we are not persuaded there was a genuine issue of material fact precluding the entry of summary judgment on the statutory fraud claim.

The employer's argument regarding its procedural unconscionability claim is also deficient. It relies on a single case, fails to make it relevant by setting out the facts of the case and analogizing them to the current circumstances, fails to provide any pinpoint citation to the principles purportedly stated there, discusses a duty "to adequately inform" which we were unable to find in the opinion, and then refers generally to "evidence" in the record and "the reasons discussed above in connection with [its] claims under the Insurance Code, the Act, and for common law fraud." We find this argument unpersuasive.

Procedural unconscionability is said to occur when, after considering all the circumstances surrounding the transaction (*Kinkel v. Cingular Wireless, LLC*, 223 Ill. 2d 1, 22-23, 857 N.E.2d 250 264 (2006)), the court determines disputed contract terms were "so difficult

20

to find, read, or understand that the plaintiff cannot fairly be said to have been aware [it] was agreeing to [them]" and the plaintiff lacked bargaining power. *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 100, 854 N.E.2d 607, 622 (2006); *Kinkel*, 223 Ill. 2d at 22, 857 N.E.2d at 264. For instance, in *Razor*, a disclaimer of consequential damages was tucked within the pages of the owner's manual placed in the glove compartment of a new car, unavailable to the consumer until she took delivery, and she "had no hand in its drafting, and no bargaining power at all with respect to its terms." *Razor*, 222 Ill. 2d at 100-01, 854 N.E.2d at 622-23. In *Frank's Maintenance*, both contracting parties were business entities, but a limitation on consequential damages was inconspicuous on the back of a purchase acknowledgment; a clause directing the plaintiff's attention to conditions on the back of the document had been stamped over, indicating it was irrelevant; and the parties never discussed the limitation. *Frank's Maintenance & Engineering, Inc. v. C.A. Roberts Co.*, 86 Ill. App. 3d 980, 991-92, 408 N.E.2d 403, 411 (1980). In contrast, in *Kinkel*, a consumer had a cellular telephone service agreement "in her possession and she either read [the terms and conditions] or could have read them if she had chosen do so" before she signed the front and initialed the back of the document, indicating she read and accepted the terms and conditions. *Kinkel*, 22 Ill. 2d at 26, 857 N.E.2d at 266. Although the agreement did not disclose she would be burdened with arbitration costs and told her to " 'request' " specific fee information from the telephone service provider, the court "[did] not find this degree of procedural unconscionability to be sufficient to render the [clause] unenforceable." *Kinkel*, 22 Ill. 2d at 26-27, 857 N.E.2d at 266-67. A car buyer in *Tortoriello* "had even more opportunity to read the arbitration provision than did the plaintiff in *Kinkel*," because she

possessed the terms for several days before affixing her signature directly below a bolded, capitalized statement

" 'SUBJECT TO TERMS & CONDITIONS ON REVERSE SIDE AND THIRD PARTY FINANCE APPROVAL.' " *Tortoriello v. Gerald Nissan of North Aurora, Inc*., 379 Ill. App. 3d 214, 234, 882 N.E.2d 157, 176 (2008). The court acknowledged the arbitration clause was written in "'legalese'" and there was a disparity of bargaining power between the consumer and the car dealer, but that a degree of disparity "is typical of contracts of adhesion, which are not *per se* unconscionable." *Tortoriello*, 379 Ill. App. 3d at 234-35, 882 N.E.2d at 176. The court concluded the arbitration clause was procedurally unconscionable to some extent, but not to such a degree that it should be invalidated. *Tortoriello*, 379 Ill. App. 3d at 236, 882 N.E.2d at 176.

With these principles and illustrations in mind, we note that the 2001 and 2002 rating agreements are short documents, all of six pages long; rather than a thick maze of fine print, they are in full-size font, with introductory titles and subtitles, most paragraphs are one or two short sentences and each paragraph is set off by a blank line above and below; the arbitration language is prominent at the top of page five and covers half a page and the choice-of-law clause appears immediately above the signature line provided for the employer. Given the brevity of the documents, their readability, and the placement of the clauses, it was impossible for even a casual reader to miss the arbitration and choice-of-law language. Equally conspicuous at the center of the first page is a sentence indicating the agreement supersedes "prior communications, negotiations [and documents]." Furthermore, the documents were transmitted to and from the employer by its agent, McWethy, an insurance broker with 37 years of experience in the

22

construction field, and the insured employer is a multistate, commercial entity rather than an individual policyholder, which are facts suggesting business sophistication. It is implausible that a sophisticated business owner reasonably believed that a six-page document repeated (" 'mirrored' ") the contents of a thick insurance contract, or reasonably believed the insurer was insisting upon the execution of documents which had no effect on their relationship. Furthermore, the insurer's transmittal letters were dated March 6 and March 7, 2002, respectively, and the employer executed the documents two weeks later on March 21, 2002. Even if we assume the broker was slow to relay the documents to the employer for signature, the documents are so short it is reasonable to conclude the employer either read the terms and conditions or could have read them if it had chosen do so before signing them. In light of these circumstances, it is reasonable to expect the employer to be aware of the contents of the rating agreements it executed. The circumstances do not indicate there was " 'some impropriety during the process of forming the contract depriving [the employer] of a meaningful choice.' " *Kinkel*, 223 Ill. 2d at 23, 857 N.E.2d at 264, quoting *Frank's Maintenance*, 86 Ill. App. 3d at 989-90, 408 N.E.2d at 410. While it is improper to expect an insured to search the fine print of a renewal policy, there is nothing untoward about enforcing the separate, short, and plainly worded agreement which this sophisticated insured chose to execute. The employer's argument regarding its procedural unconsionability claim is deficient because neither the facts nor the law are on its side.

Finally, the employer addresses the circuit court's decision that disputes related to the 2003 and 2004 policy years are subject to arbitration. The employer never signed the program

agreements for these two policy years and it is undisputed that unless a party has contracted to arbitrate, it cannot be forced to arbitration. *Vassilkovska*, 358 Ill. App. 3d at 25, 830 N.E.2d at 623. The employer argues the ruling should be reversed because the insurer waived any right to compel arbitration of disputes arising from the 2003 and 2004 policies when it did not cancel the 2003 policy despite the employer's failure to execute the 2003 rating agreement and when it issued the 2004 policy with full knowledge of the employer's refusal to execute the 2003 rating agreement.

The insurer responds with the well-settled principle of contract law that a party may, by his acts and conduct, assent to contract terms and become bound by them even though he has not signed the contract, if it is clear that his conduct relates to the specific contract in question. *Landmark Properties, Inc. v. Architects International-Chicago*, 172 Ill. App. 3d 379, 383, 526 N.E.2d 603, 606 (1988). The insurer contends that the evidence adduced during the four-day proceeding supports the circuit court's finding that the employer's conduct bound it to the 2003 and 2004 program agreements even though it did not execute the documents. The insurer points to testimony indicating the employer withheld its signature, not because it objected in any way to the contents of the rating agreements, but because it wanted to meet with the insurer about claims handling and thought withholding signature would leverage an appointment. The circuit court emphasized that the company owner's hesitation and eventual refusal to sign "[were not] really about the arbitration clause," but were because the owner "wanted to hold the program agreements hostage so [the insurer would capitulate to a meeting]." Furthermore, the employer's insurance agent, McWethy, was the go-between and kept the insurer in the dark about the

employer's stance. McWethy was concerned that if the insurer knew the employer was deliberately refusing to execute the documents, the insurer would cancel the coverage, and so each time the insurer asked, McWethy answered that he was "working on" getting the signatures. The insurer persistently pursued the signatures in 2003 and 2004 and McWethy continued to obscure the situation until late in the fourth policy year. At that point, the insurer declined to renew coverage for the 2005 policy year and cited the lack of signatures as one of its reasons for nonrenewal.

In our opinion, even if the insurer has accurately summarized the chain of events, they do not indicate the employer ratified the 2003 and 2004 program agreements through its conduct.

In *Landmark Properties*, which was cited by the insurer, an architectural firm orally agreed during the summer of 1983 to assist Chicago real estate developers with a project at the corner of Sheffield and Fullerton, and followed up with a letter indicating the parties should work together on an hourly basis until they were able to define and finalize the services to be provided. *Landmark Properties*, 172 Ill. App. 3d at 380-81, 526 N.E.2d at 604. In October 1983, the architects sent the developers two copies of a form agreement and asked the developers to sign one copy and retain the other. *Landmark Properties*, 172 Ill. App. 3d at 380, 526 N.E.2d at 604. The form agreement included a mandatory arbitration clause. *Landmark Properties*, 172 Ill. App. 3d at 380, 526 N.E.2d at 604. The developers never signed or returned the form, but over the next two months, they accepted the architects' services and construction documents. *Landmark Properties*, 172 Ill. App. 3d at 380, 526 N.E.2d at 604. In January 1984, the architects sent a letter which outlined their compensation for phase two of the project and offered to draft

an agreement about that phase. *Landmark Properties*, 172 Ill. App. 3d at 380-81, 526 N.E.2d at 604. The developers orally accepted the fee arrangement, and although the architects followed up with a form agreement for the developers' signature, the developers never signed or returned this additional document. *Landmark Properties*, 172 Ill. App. 3d at 381, 526 N.E.2d at 604. After that, the developers stopped paying the architects' invoices, but promised the payments were forthcoming and in March 1984 promised in writing that payments would be made if the services were performed in accordance with the form agreement. *Landmark Properties*, 172 Ill. App. 3d at 381, 526 N.E.2d at 604. Negotiations and threats ensued, and in May 1985, the developers filed for arbitration. *Landmark Properties*, 172 Ill. App. 3d at 381, 526 N.E.2d at 604. The developers, however, backed out of their arbitration action, and filed suit in the circuit court, contending the parties had an oral agreement only and had not committed to the form agreement which was proposed by the architects but never executed. *Landmark Properties*, 172 Ill. App. 3d at 381-82, 526 N.E.2d at 605. After conducting a proceeding under section 2(b) of the Uniform Arbitration Act, the court ruled against the developers because the architect's initial letter indicated the oral agreement did not sufficiently define the services needed, and the developers failed to reject the form agreement, stated they would pay for services rendered in accordance with it, and commenced an arbitration action as provided in the agreement. 710 ILCS 5/2(b) (West 2000); *Landmark Properties*, 172 Ill. App. 3d at 383-84, 526 N.E.2d at 606.

Similar reasoning was applied in *Amelco Electric* regarding an agreement between a general contractor and a subcontractor for work on a 1974 O'Hare Airport runway improvement project. *Amelco Electric Co. v. Arcole Midwest Corp.*, 40 Ill. App. 3d 118, 119, 351 N.E.2d 349,

350 (1976). After reaching an oral agreement, the subcontractor ordered materials and began to hire sufficient employees to implement its bid. *Amelco Electric*, 40 Ill. App. 3d at 119, 351 N.E.2d at 350. About four days later, after finalizing details with the City of Chicago, the general contractor mailed a written contract to the subcontractor for execution. *Amelco Electric*, 40 Ill. App. 3d at 119, 351 N.E.2d at 350. The subcontractor ignored the matter and never expressed an objection, verbally or in writing, to the written contract as a whole or to any of its terms. *Amelco Electric*, 40 Ill. App. 3d at 125, 351 N.E.2d at 354. It began, however, to perform the work specified in the written contract and adhered to other contract terms such as submitting minority employment documentation and daily subcontractor reports to the City. *Amelco Electric*, 40 Ill. App. 3d at 121, 351 N.E.2d at 351. About three weeks later, the general contractor sent a second letter asking the subcontractor to return the executed contract and other documents, but the subcontractor continued to ignore the request. *Amelco Electric*, 40 Ill. App. 3d at 121, 351 N.E.2d at 351. About a week after that, the general contractor terminated the subcontractor from the project because it was behind schedule, which led to a lawsuit seeking, among other things, damages from the general contractor for breach of an oral contract. *Amelco Electric*, 40 Ill. App. 3d at 121-22, 351 N.E.2d at 352. The circuit and appellate courts rejected the subcontractor's contention that the parties were still negotiating a written agreement when the general contractor terminated the relationship and that the subcontractor intended to object to some of the terms in the contract it received in the mail. *Amelco Electric*, 40 Ill. App. 3d at 125, 351 N.E.2d at 354. The appellate court characterized the subcontractor's purported intent as "a subjective and unilateral decision *** which was apparently never communicated to [the general

contractor] in any manner." *Amelco Electric*, 40 Ill. App. 3d at 125, 351 N.E.2d at 354. It held that the written agreement took effect when the subcontractor complied with its provisions and failed to express an objection, orally or in writing, to the general contractor. *Amelco Electric*, 40 Ill. App. 3d at 125, 351 N.E.2d at 354.

The circuit court also considered *Compass Environmental*, which is another case involving an oral subcontract and a major construction project. *Compass Environmental, Inc. v. Polu Kai Services L.L.C.*, 379 Ill. App. 3d 549, 882 N.E.2d 1139 (2008). In the aftermath of Hurricane Katrina, a company headquartered in Illinois was retained as a subcontractor to install government-supplied sheeting and temporary roofs on Louisiana residences that were damaged in the storm. *Compass Environmental*, 379 Ill. App. 3d at 551, 882 N.E.2d at 1153. On October 10, 2005, it verbally hired a Virginia company as a sub-subcontractor to perform some of the work and asked it to start the project in Sulpher, Louisiana, and anticipate receiving a two-page purchase order that needed to be signed and returned to Illinois. *Compass Environmental*, 379 Ill. App. 3d at 553, 882 N.E.2d at 1155. The Virginia company received a copy of the purchase order through email, and four days after beginning the project, received a FedEx package in Louisiana which included the original purchase order. *Compass Environmental*, 379 Ill. App. 3d at 553-54, 882 N.E.2d at 1155. The bottom of both pages of the purchase order provided, " 'SEE TERMS AND CONDITIONS ON REVERSE SIDE,' " and those terms and conditions included an Illinois forum-selection clause. *Compass Environmental*, 379 Ill. App. 3d at 551, 882 N.E.2d at 1153. The email version did not include the reverse side of the purchase order. *Compass Environmental*, 379 Ill. App. 3d at 553, 882 N.E.2d at 1155. When the Illinois

28

company filed a breach of contract action in Illinois on the basis of the forum selection clause, the Virginia company unsuccessfully motioned to dismiss for lack of jurisdiction, arguing in part that neither party executed the purchase order attached to the complaint. *Compass Environmental*, 379 Ill. App. 3d at 551-52, 882 N.E.2d at 1154. On interlocutory appeal, the court held that the Virginia company agreed to the forum selection clause on the reverse side of the purchase order when it received the email version of the purchase order and continued working without asking about what was on the reverse side. *Compass Environmental*, 379 Ill. App. 3d at 554, 882 N.E.2d at 1155. In addition, "upon receipt of the purchase order via FedEx, [the Virginia company neither] inquired about the terms and conditions on the reverse side, nor did it stop performing under the contract or attempt to rescind." *Compass Environmental*, 379 Ill. App. 3d at 554, 882 N.E.2d at 1155-56. Thus, the company's affirmative performance of the contract terms signified its acceptance of the agreement.

In our opinion, it was a mistake for the circuit court to rely on the principle discussed in *Landmark Properties*, *Amelco Electric*, and *Compass Environmental*. In each of these cases, the opponent of a written contract not only failed to object to it but also took affirmative action consistent with its terms. In *Landmark Properties*, the developers' affirmative action was stating in a letter that they would pay the architects' invoices if they performed the services specified in the written contract; in *Amelco Electric*, the subcontractor provided services, documentation, and daily reports specified in the written contract, and in *Compass Environmental*, the sub-subcontractor performed the roofing and installation tasks required by the written contract. *Amelco Electric*, 40 Ill. App. 3d at 121, 351 N.E.2d at 351. Here, however, the program

29

agreements for the 2003 and 2004 policies were separate, distinct contracts from the insurance policies, therefore, the employer's payment of premiums or acceptance of coverage did not signify acceptance of the separate program agreements. We are unaware of any conduct by the employer which could be construed as affirmative acceptance of the separate agreements. Furthermore, both parties consistently demonstrated their understanding that the agreements needed to be signed to become effective. Under Illinois law, when an offer is made and no specific mode of acceptance is specified, the acceptance does not need to be in any particular form or wording. *Calo, Inc. v. AMF Pinspotters, Inc.*, 31 Ill. App. 2d 2, 8, 176 N.E.2d 1, 5 (1961). However, where the parties make a writing and its execution conditions precedent to its completion, there is no contract until this occurs. *Calo*, 31 Ill. App. 2d at 8-9, 176 N.E.2d at 5. The insurer drafted the documents to include signature lines, underwriter Kurszewski persistently asked McWethy to obtain his client's signatures, and Kurszewski repeatedly tendered additional copies of the documents for this reason. During the section 2(b) proceedings, Kurzewski was asked "Did you ever give up on your attempts to have these documents signed?" and he answered unequivocally, "No," demonstrating his understanding that the documents were ineffective without the parties' signatures. 710 ILCS 5/2(b) (West 2000). Furthermore, the insurer cited the lack of signatures as one of the reasons it was unwilling to insure the employer for the 2005 policy year. The record also shows that the employer believed its signature was so indispensable that if it continued to hold out, the insurer would capitulate to a face-to-face meeting regarding its claims practices. It was error to conclude on the basis of this record that the parties' conduct bound them to the written program agreements for the 2003 and 2004 policy years. The facts and

law do not support this ruling.

The summary judgment proceeding and evidentiary hearing also encompassed counts I, III, IV, and V of the second amended complaint, but the employer has not challenged the disposition of those claims.

The preceding analysis leads us to conclude the circuit court correctly determined that the employer was bound by the program agreements it executed for the 2001 and 2002 policy years and that disputes arising from those policy years are subject to the mandatory arbitration clause. However, it also indicates the circuit court erred in determining the employer's conduct was its agreement to the program agreements for the 2003 and 2004 policy years and that disputes from those policy years must be arbitrated. Therefore, we affirm the portion of the order directing the parties to arbitrate their dispute arising from the 2001 and 2002 policies and we reverse as an abuse of discretion the portion of the order directing the parties to arbitrate their dispute regarding the 2003 and 2004 policies. We remand this matter for further proceedings consistent with this opinion.

Affirmed in part and reversed and remanded in part.

CAHILL, P.J., and R.E. GORDON, J., concur.